## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

ROSALYNN CROSS WITHERSPOON,   )
                                  )
        Plaintiff,                 )
                                    )
v.                                       )          Civil Action No. 1:07-0802
                                    )
UNITED STATES OF AMERICA, *et al.*,   )
                                    )
        Defendants.           )

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment. (Document No. 37.) The Court notified Plaintiff pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to the Defendants' Motion and submit Affidavit(s) or statements and/or other legal or factual material supporting her claims as they are challenged by Defendants in moving for summary judgment. (Document No.39.) Plaintiff has filed Responses to Defendants' Motion and Exhibits in Support. (Document No. 43, 45, and 46.) Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court grant Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment.

### PROCEDURAL HISTORY

On December 10, 2007, Plaintiff, an inmate formerly incarcerated at FCI Alderson, located in Alderson, West Virginia, and acting *pro se*, filed a Complaint and an Application to Proceed Without Prepayment of Fees and Affidavit.[1] (Document Nos. 1 and 2.) Plaintiff names the following

---

[1] Because Plaintiff is acting *pro se*, the documents which she has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed

as Defendants: (1) United States of America; (2) Debra Hickey, former Warden of FPC Alderson; (3) Alice Lowe, Assistant Warden; (4) James Blankenship, Health Service Administrator; (5) Dr. Neal Rehburg, Clinical Director; and (6) Dr. Callaway. (Document No. 1.) Plaintiff alleges that Defendants failed to provide adequate medical care concerning the treatment of her skin cancer. Plaintiff asserts that on November 1, 2006, Dr. Rehburg performed a biopsy on two spots on Plaintiff's lip. Plaintiff claims she did not receive the biopsy results until December 6, 2006. On December 6, 2006, Plaintiff was informed that she had basal cell carcinoma, a form of skin cancer.[2] Plaintiff was transported on December 21, 2006, to Dr. Paine's office for an evaluation. Plaintiff states that Dr. Paine recommended surgery "as soon as possible." Plaintiff alleges that the skin cancer on her lip was not surgically removed until March 29, 2007. As a result of the surgery, Plaintiff states that her mouth was "sewn shut" for a month and a half. During this time period, Plaintiff asserts that she was forced to consume only liquids. Plaintiff contends that Defendants provided liquids that contained inadequate nutrition. On May 1, 2007, Plaintiff was transported to Dr. Paine's office for a cosmetic procedure to "revise some of the lip to get it the right thickness." Plaintiff was transported back to Dr. Paine's office on May 15, 2007, to have sutures removed that allegedly "grew into [her] face" as a result of prison officials missing a scheduled appointment. Plaintiff argues that Defendants failed to timely treat her skin cancer and comply with Dr. Paine's treatment plan, which resulted in the "disfigurement of [her] face." Plaintiff states that there is a "blood pool formation now grown inside the graft and having nodules, which pull and cause tension in my lip." Plaintiff asserts that she was last evaluated by Dr. Paine on May 15, 2007. Finally, Plaintiff  alleges that she is experiencing problems with her teeth and gums as a result of the lack of proper dental care during the period of time that her mouth was "sewn shut." Plaintiff requests

---

liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

[2]  Basal cell carcinoma is one of the most common forms of skin cancer.

compensatory damages and "for [her] face [and teeth] be repaired."[3]

By Order entered on August 28, 2009, the undersigned granted Plaintiff's Application to Proceeding Without Prepayment of Fees. (Document No. 7.) In screening Plaintiff's Complaint, the undersigned determined that Plaintiff had potentially stated a claim under <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388, 395 -97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but failed to state a claim under the Federal Tort Claims Act [FTCA], 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2671, *et seq.*[4] (<u>Id.</u>) On January 4, 2010, Defendants filed a Motion to Dismiss for Insufficient Service of Process. (Document No. 29.) Plaintiff filed her Response on January 11, 2010. (Document No. 32.) By Order entered on January 14, 2010, the undersigned denied Defendants' Motion to Dismiss for Insufficient Service of Process as moot and ordered that Defendants file a Response to Plaintiff's Complaint within sixty days of January 11, 2010. (Document No. 34.)

On January 26, 2010, Defendants filed their Motion to Dismiss, or in the Alternative Motion for Summary Judgment and Memorandum in Support. (Document Nos. 37 and 38.) Defendants argue that Plaintiff's Complaint should be dismissed based on the following: (1) Plaintiff failed to exhaust her administrative remedies concerning her claim of an inadequately nutritious liquid diet and inadequate dental care (Document No. 38, pp. 3 - 5.); (2) "Defendant Blankenship is a U.S. Public Health Service employee and is therefore entitled to absolute immunity" (<u>Id.</u>, pp. 6 - 8.); (3) "The Defendants must be dismissed due to Plaintiff's lack of specificity" (<u>Id.</u>, p. 8.); (4) Plaintiff

---

[3]  Although Plaintiff indicates in her Complaint that she has a civil action pending in the Northern District of West Virginia involving the same facts as stated above, the undersigned finds that the only case filed by Plaintiff in the Northern District involved a claim of excessive force by prison officials. *Witherspoon v. North Central Regional Jail, et al.*, 1:05-cv-0029 (N.D.W.Va. Apr. 25, 2006).

[4]  The undersigned instructed Plaintiff to notify the Court if her intent was to file an action against the United States pursuant to the FTCA. (Document No. 7, p. 4.)

cannot establish a claim for deliberate indifference to her medical conditions (Id., pp. 8 - 19.); (5) The Defendants are entitled to qualified immunity (Id., pp. 19 - 25.); and (6) Plaintiff's claims against the Defendants in their official capacities are barred by sovereign immunity (Id., p. 25.). In support of their Motion, Defendants attach the following Exhibits: (1) Declaration of Sharon Wahl with attached copies of the SENTRY Administrative Remedy History, Administrative Remedy Id Nos. 457682-F1, R1, A1, and the Health Services Administrator Position Description (Document No. 37-1.); (2) Declaration of James Blankenship (Document No. 37-2.); (3) Declaration of Neal Rehburg with attached copies of Plaintiff's medical records (Document Nos. 37-3 and 37-4.); (4) Declaration of Deborah Hickey (Document No. 37-5.); and (5) Declaration of Angela Basham-Callaway (Document No. 37-6.).

On February 2, 2010, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff, advising her of the right to file a response to the Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment. (Document No. 39.) On April 1, 2010, Plaintiff filed her Response. (Document No. 43.) First, Plaintiff argues that Defendant Blankenship cannot claim immunity based upon his supervisory capacity because "Blankenship is who first informed me that I had cancer but at the same time altered the biopsy report."[5] (Id., p. 3.) Plaintiff argues that Defendant Blankenship altered her medical records by "crossing out the name and hand writing the name Rosalynn above the name Arneal." (Id.) Second, Plaintiff contends that her appointment with an "outside" physician was scheduled under the incorrect name of "Arneal." (Id., p. 4.) Third, Plaintiff states that Dr. Blaine "informed me of the severity of needing the surgery to remove the cancer. Dr. Blaine suggested that it be done as soon as possible after the New Year."[6]

_____

[5] Specifically, Plaintiff states that her name was listed as Arneal Witherspoon, rather than Rosalynn Witherspoon. (Document No. 43, pp. 2 - 3.)

[6] It appears that Plaintiff was initially evaluated by Dr. David A. Blaine. Dr. Blaine then referred Plaintiff to Dr. James Paine for surgery due to Dr. Paine's "cosmetic and facial plastic

(Id., p. 4.) Plaintiff complains that Defendants did not comply with Dr. Blaine's recommendation that the surgery occur "as soon as possible." (Id.) Fourth, Plaintiff complains that her sutures were not timely removed on May 7, 2010, which resulted in the sutures "becoming embedded into my skin." (Id., p. 5.) Specifically, Plaintiff states that her "[s]utures were put in on the May 1 visit" and removed by Dr. Pain on May 15, 2007. (Id.) Fifth, Plaintiff states that "[a]ccording to Dr. Pain, I was to be seen again by him for post-surgical care, but . . . May 15, 2007, was the last visit to his office." (Id.) Thus, Plaintiff alleges that her "plan of care provided by Dr. Pain was broken by FPC Alderson [because] [t]hey failed to follow [the plan] in many ways: nutritionally, medical (including follow-up appointments), and dental care." (Id.) Sixth, Plaintiff states that she "requested dental swabs for my mouth, since it had already been a month. The dentist ordered me a box of them, I was told I could not have them, one was provided to me on one occasion at HSU." (Id., pp. 5 - 6.) Seventh, Plaintiff states that she tested positive for H-pylori in April, 2007, which "was caused by problems with my stomach and possible lack of solid nourishment." (Id., p. 6.) Eighth, Plaintiff states that Defendants refused to schedule her an appointment with Dr. Paine following her complaints of "severe tension" in her lips. (Id.) Ninth, Plaintiff states that she is "faulting Warden Hickey and Assistant Warden Lowe for allowing correctional officers of the prison to alter records and make appointments under altered false names" and "for not seeing to my medical needs, nutritional and dental care, throughout this process." (Id., p. 8.) Finally, Plaintiff alleges she has suffered the following substantial injuries: (1) "Skin graft with possible extra tissue loss due to the extended wait for the surgery;" (2) "Facial and tissue scaring with nodules and tension rips from sutures being embedded;" (3) "Lip damage which has caused function control including drooling, tension, and pulling;" (4) "H-pylori and pancreatitis;" (5) "Teeth pulled from excessive dental neglect;" and (6) "It's been three years and another surgery is being recommended by Dr. Paine to correct the damage that has been caused and

---

expertise." It appears that Dr. Blaine and Paine are both doctors at Mountain State ENT & Facial Plastic Surgery, Inc. (Document No. 37-4, p. 59.)

was ignored." (Id., pp. 8 - 10.)

In support of her Response, Plaintiff attaches the following Exhibits: (1) A copy of Plaintiff's divorce decree (Document No. 43-1.); (2) A copy of Plaintiff's medical records from FCI Alderson (Document Nos. 43-2, 43-3, 43-4, and 43-5.); (3) A copy of Plaintiff's Administrative Remedies and Responses (Document No. 43-6.); (4) A copy of Plaintiff's medical records from Dr. Paine (Document No. 43-7.); and (5) A copy of Plaintiff's medical records from Health Access (Document No. 43-8 and 43-9.).

On April 2, 2010, the Defendants filed their Reply. (Document No. 44.) Defendants continue to argue that Plaintiff's skin cancer was timely diagnosed and successfully treated. (Id., p. 3.) Defendants contend that "[u]nder the guise of deliberate indifference, plaintiff now seeks monetary compensation for the scarring of her lips due to the removal of the cancer." (Id.) Defendants further note that "plaintiff now seeks to have the defendants responsible for all her medical problems, including H. Pylori, pancreatitis, and dental problems." (Id., p. 2.)  Defendants assert that "the medical records which [Plaintiff] attached to her response, including Attachment 5, establish that these conditions are unrelated to her lip cancer surgery during the time that she was incarcerated at FPC Alderson." (Id.) Defendants further argue that there is no evidence that Plaintiff's pancreatitis and dental problems are attributable to her period of incarceration. (Id., pp. 2 - 4.)

Also on April 2, 2010, Plaintiff filed an "Amendment for Response Due April 2, 2010, to Add Attachment # 6." (Document No. 45.) Plaintiff attaches Exhibit 6, which "includes the administrative remedies for the H. Pylori and the responses received from administration." (Id.) On April 9, 2010, Plaintiff filed a Motion for Leave to File Surreply Response (Document No. 46.) and her Surreply (Document No. 46-1.). In her Surreply, Plaintiff states as follows (Document No. 46-1.):

> I ask the court to allow and accept this reply to Defendant's Reply filed on April 2, 2010. I submitted the attachments 1 through 6 as evidence for the facts of which I stated the defendants are responsible for the altering of records by the name of

6

ARNEAL to Rosalyn. The fact that this delayed diagnosis by the medical doctor, then the continued use of the name to schedule and even transport to attend this appointment and then make a plan of care for the physician (Dr. Blaine/Dr. Paine) located outside the prison and then violated the plan of care by not following through the advised plan is not only deliberate, but I do believe a violation of my prisoner rights and may even be a constitutional violation or possibly prisoner rights as well. I do know I established H pylori during the treatment of the cancer and still HAVE it to date. I did see a physician as soon as possible even while at the half way house and have been treated by him, Dr. Omar, who is a specialist at Health Access. The way I answer to the question of how am I feeling is accordingly to the day. I have bad days and good days and my response depends upon this. I have been hospitalized twice as the records show. I did see Dr. Paine, the surgeon who did the initial surgeries from prison on February 18, 2010, and Dr. Paine suggested to do more surgery to repair the damage that HAD BEEN NEGLECTED. Dr. Paine gave a surgical sheet which is in the attachment to have further surgery and Dr. Paine felt it could help the DROOLING AND TENSION and I do agree this would not have been so bad had the prison complied with Dr. Paines' PLAN OF CARE. Dr. Paine put in the notes how the prison failed to comply with his plan of care on May 2007 attachments. Then Dr. Rehburg gave documents that I attended a July 17, 2007, appointment and the only one to see me that day was Dr. Rehburg himself. Further, by January, 2008, Dr. Rehburg approved me to see Dr. Paine by committee and this was never done. I do not ask the defendants to take care of ALL of my medical needs, as stated I do ask the court to see all the facts I submitted and the documents are able to show the facts I stated. I ask the court to take a very good look at what all the documents state. Also, I submitted my current doctor's records to show I am taking care of my health to the best of my ability so the court can see this. I was beaten in 1982, and if Dr. Omar thought this was the cause of the damage for the hospitalization, then Dr. Omar would have noted the exact cause. This was not made in the response, he only noted the abuse of being beaten. Dr. Omar does see me regularly due to ALL health issues. I ask and respectfully request that the court take a fair look at all the attachments I submitted. There is proof in each attachment based upon the facts.

On April 12, 2010, Defendant Blankenship filed a Notice of Supplemental Authority. (Document No. 47.) Defendant Blankenship states that "there is now pending in the United States Supreme Court the case of Migliaccio v. Castaneda, No. 08-1529, in which the question presented to the court is 'Does 42 U.S.C. § 233(a) make the Federal Tort Claims Act the exclusive remedy for claims arising from medical care and related functions provided by the public health service personnel, thus barring Bivens actions?'" (Id., p. 1.) Defendant Blankenship asserts that he was a

7

member of the Public Health Service at all relevant times, and a decision in the above cited case "will have a direct impact on whether a <u>Bivens</u> action can be maintained against him." (<u>Id.</u>, p. 2.) Also on April 12, 2010, Defendants filed their Response in Opposition to Plaintiff's Motion for Surreply.[7] (Document No. 48.)

<u>THE STANDARD</u>

## <u>Motion to Dismiss</u>

A *pro se* Complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Haines v. Kerner</u>, 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), <u>quoting</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45 - 46 (1957). Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. <u>Denton v. Hernandez</u>, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

## <u>Summary Judgment</u>

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an

---

[7] By separate Order entered this day, the undersigned has granted Plaintiff's Motion for Leave to File a Surreply.

8

essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A Bivens action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under Bivens must show the violation of a valid constitutional right by a person acting under color of federal law.[8] The United States Supreme Court has held that an inmate may name a federal

---

[8] Inmates may file claims of liability against the United States under the FTCA but may not assert claims of personal liability against prison officials for violations of their constitutional rights. *Carlson v. Green*, 446 U.S. at 21-23, 100 S.Ct. at 1472 -74. By contrast, under *Bivens* inmates may assert claims of personal liability against individual prison officials for violations of their constitutional rights but may not assert claims against the government or prison officials in their official capacities. The Supreme Court held in *Carlson*, 446 U.S. at 18 - 21, 100 S.Ct. at 1471-72,

officer in an individual capacity as a defendant in alleging an Eighth Amendment constitutional violation pursuant to Bivens. See Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). However, Bivens claims are not actionable against the United States, federal agencies, or public officials acting in their official capacities. See FDIC v. Meyer, 510 U.S. 471, 475, 484-86, 114 S.Ct. 996, 127 L.Ed. 2d 308 (1994); Berger v. Pierce, 933 F.2d 393, 397 (6th Cir. 1991); Reinbold v. Evers, 187 F.3d 348, 355 n. 7 (4th Cir. 1999).

1.      **Exhaustion of Administrative Remedies:**

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)(1996), requires that inmates exhaust available administrative remedies prior to filing civil actions though the administrative process may not afford them the relief they might obtain through civil proceedings.[9] Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006); Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)(The Prison Litigation Reform Act's exhaustion requirement applies to all inmate suits about prison life whether they involve general circumstances or particular episodes and whether they allege excessive force or some other wrong.); Booth v. Churner, 532 U.S. 731, 121

---

that an inmate could pursue a *Bivens* action independent of a FTCA action. The Court found that Congress did not intend to pre-empt a *Bivens* remedy when it enacted the FTCA. *Id.* The Court noted that the legislative history of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.*, 446 U.S. at 19 - 20, 100 S.Ct. at 1471 -72. Relying upon *Carlson*, the Fourth Circuit found that the availability of relief under the FTCA does not automatically foreclose a *Bivens* action. *Dunbar Corp v. Lindsey*, 905 F.2d 754, 762 (4ᵗʰ Cir. 1990). The Court pointed out other distinctions between FTCA and *Bivens* actions in *Dunbar Corp.*: (1) only compensatory damages are available in FTCA actions, whereas compensatory and punitive damages are available under *Bivens* and (2) FTCA claims must be tried to the Court, whereas *Bivens* claims may be tried to a jury. *Id.*

[9] 42 U.S.C. § 1997e(a) provides as follows:

No action shall be brought with respect to prison conditions under section 1983 of this title or any other federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available are exhausted.

S.Ct. 1819, 1820,149 L.Ed.2d 958 (2001)("Under 42 U.S.C. § 1997e(a), an inmate seeking only money damages must complete any prison administrative process capable of addressing the inmate's complaint and providing some form of relief, even if the process does not make specific provision for monetary relief."). "[T]here is no futility exception to the PLRA's exhaustion requirement." Massey v. Helman, 196 F.3d 727, 733 (7th Cir. 1999). But the plain language of the statute requires that only "available" administrative remedies be exhausted. A grievance procedure is not "available" if prison officials prevent an inmate from using it. Dale v. Lappin, 376 F.3d 652, 656 (7th Cir. 2004); Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003)(inmate lacked available administrative remedies for exhaustion purposes where inmate was unable to file a grievance because prison officials refused to provide him with the necessary grievance forms); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001)(allegations that prison officials failed to respond to his written requests for grievance forms were sufficient to raise an inference that inmate had exhausted his available administrative remedies.)

If an inmate exhausts administrative remedies with respect to some, but not all, of the claims he raises in a Section 1983, Bivens or FTCA action, the Court must dismiss the unexhausted claims and proceed with the exhausted ones. See Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 913, 166 L.Ed.2d 798 (2007)("The PLRA does not require dismissal of the entire complaint when a prisoner has failed to exhaust some, but not all, of the claims included in the complaint. * * * If a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad.") It appears to be the majority view as well that exhausting administrative remedies after a Complaint is filed will not save a case from dismissal. See Neal v. Goord, 267 F.3d 116, 121-22 (2d Cir. 2001)(*overruled on other grounds*), a Section 1983 action, citing numerous cases. The rationale is

11

pragmatic. As the Court stated in <u>Neal</u>, allowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court. Moreover, if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court would have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset. <u>Neal</u>, 267 F.3d at 123. In <u>Freeman v. Francis</u>, 196 F.3d 641, 645 (6th Cir. 1999), the Court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court.. . .The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." Thus, the PLRA requires that available administrative remedies must be exhausted before the filing of a suit in Federal Court. It is further clear that the PLRA does not require that an inmate allege or demonstrate that he has exhausted his administrative remedies. <u>See</u> <u>Jones v. Bock</u>, <u>supra</u>; <u>Anderson v. XYZ Correctional Health Services</u>, 407 F.3d 674, 677 (4th Cir. 2005). Failure to exhaust administrative remedies is an affirmative defense. Prison officials have the burden of proving that the inmate had available remedies which he did not exhaust. <u>See</u> <u>Dale v. Lappin</u>, 376 F.3d 652, 655 (7th Cir. 2004)("Although exhaustion of administrative remedies is a precondition to a federal prisoner filing a <u>Bivens</u> suit, [citations omitted] failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving." (Citations omitted))

For <u>Bivens</u> purposes, proper exhaustion of available administrative remedies requires that "a prisoner must submit inmate complaints and appeals in the place, and at the time, the prison's administrative rules require." <u>Dale v. Lappin</u>, 376 F.3d at 655 (internal citations omitted); <u>also</u> <u>see</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006)(stating that "[p]roper

12

exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings"). The Federal Bureau of Prisons [BOP] has established an Administrative Remedy Program, 28 C.F.R. § 542.10, *et seq.*, through which an inmate may seek formal review of issues or complaints relating to confinement. Depending upon at what level an inmate initiates it, the BOP's Administrative Remedy Program is a three-step or four-step grievance procedure. As a general matter, a federal inmate is required first to attempt to resolve her complaints informally by the submission of an "Inmate Request to Staff Member" form. 28 C.F.R. § 542.13. The inmate's request may be rejected if improper, and the inmate will then be advised of the proper administrative procedure. Id. Within 20 days after the circumstances occurred which are the subject of the inmate's complaints, the inmate must complete this first step and submit a formal "Administrative Remedy Request" on a BP-9 form to an institution staff member designated to receive such Requests, 28 C.F.R. § 542.14(a) and (c)(4), or under exceptional circumstances to the appropriate Regional Director. Id., § 542.14(d). The Warden of the institution and the Regional Director must respond to the inmate's Request within 20 and 30 days respectively. Id., § 542.18. If the inmate's Request was directed to the Warden of the institution and the Warden's response is unfavorable, the inmate may appeal within 20 days to the Regional Director on a BP-10. Id., § 542.15(a) and (b). If the Regional Director's response is unfavorable, the inmate may appeal to General Counsel on a BP-11 form within 30 days after the Regional Director signed the response. Id., § 542.15(a). General Counsel has 40 days to respond to the inmate's appeal. Id., § 542.18. The administrative process is exhausted when General Counsel issues a ruling on the inmate's final appeal. Id., § 542.15(a). The entire process takes about 120 days to complete. An inmate's

13

submission may be rejected at any level for failure to comply with the administrative remedy requirements or if the submission is written in an obscene or abusive manner. Id., § 542.17(a). The inmate will be provided with notice of any defect and whether the defect is correctable. Id., § 542.17(b). If a request or appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection to the next appeal level. Id., § 542.17(c).

In their Motion, Defendants acknowledge that Plaintiff "exhausted her administrative remedies with regard to the skin cancer on her lip and her claims that she did not receive proper follow-up care." (Document No. 38, p. 5.) Defendants, however, contend that Plaintiff filed no administrative remedies "regarding the provision of an inadequately nutritious liquid diet during her surgical recovery" or "regarding dental care or oral hygiene." (Id.) Defendants note that Plaintiff is now procedurally barred from exhausting the above claims because the rules required Plaintiff "to file any administrative remedy within 20 days of the date of the incident about which she complains." (Id.) Defendants therefore argue that Plaintiff's claims of an inadequate liquid diet and the lack of dental care and oral hygiene should be dismissed with prejudice. (Id.) In support, Defendants submit the Declaration of Ms. Sharon Wahl, a Paralegal for the Consolidated Legal Center at FCI Beckley. (Document No. 37-1.) Ms. Wahl states that "[t]he Beckley Consolidated Legal Center oversees legal matters arising at various Bureau of Prisons institutions, including matters that arise at the Federal Prison Camp, Alderson, West Virginia." (Id., p. 1.) Ms. Wahl declares that in her position she has access to SENTRY, the Bureau of Prisons' online system containing, among other things, information about inmates' administrative remedy filings. (Id.) Ms. Wahl explains that she also has access to inmates' central files and medical records. (Id.) Specifically, Ms. Wahl states as follows in her Declaration (Id., pp. 1 - 2.):

14

8.      A review of Plaintiff's administrative remedy history in the instant case as found on SENTRY shows Plaintiff filed six administrative remedies while in the custody of the BOP.

9.      All of Plaintiff's remedies concern medical care at FPC Alderson.

10.     Plaintiff exhausted her administrative remedies with regard to the skin cancer on her upper lip and her claims that she did not receive proper follow-up care for the skin cancer.

11.     Plaintiff filed remedies on this issue at all three levels, and the requests were denied at each level of review.

12.     Plaintiff filed no administrative remedies regarding the provision of an inadequately nutritious liquid diet during her surgical recovery.

13.     Plaintiff filed no administrative remedies regarding dental care or oral hygiene.

In response, Plaintiff merely states that she filed administrative remedies, but "all remedies were denied." In support, Plaintiff attaches copies of the following: (1) Copy of Plaintiff's "Inmate Request to Staff" dated November 15, 2006, requesting the results of her biopsy and x-ray (Id., pp. 5 - 6, 9.); (2) Copy of Plaintiff's "Inmate Request to Staff" dated November 15, 2006, requesting copies of her medical records (Id., p. 8.); (3) Copy of Plaintiff's "Inmate Request to Staff" dated January 18, 2007, requesting copies of all medical records (Document No. 43-6, pp. 4, 10.); (4) Copy of Plaintiff's "Inmate Request to Staff" dated January 29, 2007, requesting to "see" Assistant Warden Lowe (Id., p. 11.); (5) Copy of Plaintiff's "Request for Administrative Remedy" (Remedy No. 457682-F1), dated June 25, 2007 (Id., pp. 16 - 17.); (6) Copy of a Receipt indicating that Plaintiff filed an Administrative Remedy Request (No. 457682-F1) on June 28, 2007, concerning "consultant referrals, recommendations" (Id., p. 13.); (7) Copy of Plaintiff's "Inmate Request to Staff" dated July 11, 2007, requesting copies of her medical records (Id., p. 7.); (8) Copy of Warden Nelson's "Response to Administrative Remedy # 457682-F1," dated July 18, 2007 (Id., pp. 20 - 21.);

15

(9) Copy of an "Extension of Time for Response" dated July 19, 2007, from the Administrative Remedy Coordinator at FPC Alderson, indicating that additional time was necessary to respond to Remedy No. 457682-F1 (Id., p. 14.); (10) Copy of Plaintiff's "Central Office Administrative Remedy Appeal" dated September 27, 2007 (Remedy No. 457682-A1) (Id., pp. 18 - 19.); (11) Copy of an "Extension of Time for Response" dated November 20, 2007, from the Administrative Remedy Coordinator at the Central Office, indicating that additional time was necessary to respond to Remedy No. 457682-A1 (Id., p. 15.); and (12) Copy of the Regional Director's response concerning Remedy No. 457682-R1, dated November 28, 2007 (Id., pp. 22 - 23.).

A review of the record reveals that Plaintiff submitted a Request for Administrative Remedy (Remedy No. 457682-F1) to the Warden of FPC Alderson on June 25, 2007, complaining that the Health Services Unit failed to follow Dr. Paine's treatment plan regarding her skin cancer. (Document No. 37-1, p. 9 - 11.) Plaintiff alleges that the"result from the missed appointment is nodular areas and facial disfigurement." (Id., p. 11.) Following an investigation, Warden Nelson denied Plaintiff's request on July 18, 2007. (Id., p. 12.) Warden Nelson found that "[a] consult was submitted to the Utilization Review Committee for an additional follow-up for scar revision; however, this consult was denied due to scar revision being considered a cosmetic procedure. You were scheduled a follow-up appointment with a physician at FPC Alderson on June 21, 2007, and have an additional follow-up appointment scheduled in July, 2007." (Id.) On July 29, 2007, Petitioner appealed to the Regional Director of the Bureau of Prisons, Mid-Atlantic Region (Remedy No. 457682-R1). (Id., p. 13.) On September 17, 2007, K.M. White, Regional Director, rejected Plaintiff's appeal finding that Plaintiff's "medical plan of care, developed and implemented by your primary care provider team, is adequate and complete." (Id., p. 14.) On September 27, 2007,

16

Petitioner appealed the denial to the Central Office (Remedy No. 457682-A1). (<u>Id.</u>, p. 16.) Harrell Watts, Administrator of National Inmate Appeals, denied Petitioner's appeal on November 28, 2007, finding that "cosmetic surgery to repair the scar will not be performed." (<u>Id.</u>, p. 17.) Mr. Watts noted that Plaintiff complained that the swelling had caused her lips to look like mushrooms. (<u>Id.</u>)

Based on the foregoing, the undersigned finds that Plaintiff fully exhausted her administrative remedies respecting Remedy No. 457682. Thus, Plaintiff properly exhausted her claim that Defendant's failed to provide adequate medical treatment and follow-up care concerning the skin cancer on her upper lip. To the extent Plaintiff claims that she received an inadequate liquid diet following surgery and improper dental care, the undersigned finds that Plaintiff has not exhausted her administrative remedies. The record is void of any evidence that Plaintiff filed an administrative remedy request concerning her claim of an inadequate liquid diet and improper dental care. It appears that Plaintiff filed only an "Inmate Request to Staff" requesting a dental cleaning, and Plaintiff was notified that she would be placed on the waiting list. (Document No. 37-4, p. 87.) Therefore, Plaintiff's claims regarding an inadequate liquid diet and dental care should be dismissed for failure to exhaust.[10]

**2.     Plaintiff has failed to establish deliberate indifference to her medical condition.**

Essentially, Plaintiff claims that Defendants acted with deliberate indifference by failing to timely and properly treat her skin cancer. Plaintiff alleges that Defendants failed to obtain the biopsy results until approximately one month after the biopsy was performed and failed to surgically

---

[10]   The undersigned further notes that there is no evidence supporting Plaintiff's conclusory allegation that the inadequate liquid diet resulted in her contracting H. Pylori. Furthermore, the record does not support Plaintiff's claim that she was given an inadequate liquid diet. It appears that Plaintiff required a special diet from the date of her surgery (March 29, 2007), until the sutures were removed (May 15, 2007). During this period of time, it appears that Plaintiff lost only fourteen pounds (284 pounds to 270 pounds). (Document No. 37-3, pp. 54, 61, 65 and Document No. 37-4, pp. 68 - 76.) Additionally, Dr. Paine noted that Plaintiff appeared to be well nourished on May 15, 2007. (Document No. 37-4, p.  70.)

remove the skin cancer for approximately three months after becoming aware that surgery was necessary. Plaintiff further contends that Defendants failed to properly follow Dr. Paine's treatment plan, which resulted in the disfigurement of her face.

In their Motion, Defendants argue Plaintiff's Complaint should be dismissed because she fails to specify the acts taken by each Defendant that violated her constitutional rights. (Document No. 38, p. 8.) Next, Defendants contend that despite Plaintiff's "broad, non-specific allegations in her Complaint, Plaintiff received timely and appropriate evaluation and treatment for her skin cancer." (Id., pp. 8 - 19.) Defendants state that "[t]here is simply no evidence of deliberate indifference to Plaintiff's lip cancer." (Id., p. 19.)

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), quoting Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct.

18

2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. The Fourth Circuit stated the applicable standard in Miltier v. Beorn, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

See also Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to

his serious medical needs.); Russell v. Sheffer, 528 F.2d 318 (4ᵗʰ Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) First, therefore, Plaintiff in this case must allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, *supra*, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, *supra*, 511 U.S. at 837, 114 S.Ct. at 1979. It is well established that a private physician under contract with a State to provide medical services to inmates acts under color of State law when treating them and may therefore be held liable under Section 1983. See West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2257, 101 L.Ed.2d 40 (1988); Conner v. Donnelly, 42 F.3d 220, 225 (4ᵗʰ Cir. 1994) ("If a physician treating a prisoner – whether by contract or referral – misuses his power by demonstrating deliberate indifference to the prisoner's serious medical needs, the prisoner suffers a deprivation under color of state law.") Plaintiff in this case must therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

A. **Plaintiff's claim of deliberate indifference in the diagnosis of her skin cancer.**

First, Plaintiff alleges that Defendants acted with deliberate indifference in diagnosing the skin cancer on Plaintiff's upper lip. Defendants contend that they are entitled to summary judgment because Plaintiff's Complaint contains "broad, non-specific allegations" and the record clearly shows that Plaintiff received timely and appropriate diagnosis. (Document No. 38, pp. 8 - 19.) In

20

Response, Plaintiff continues to argue that Defendants failed to properly and timely diagnosis her skin cancer. (Document No. 43, p. 7.) Plaintiff first complains that "Blankenship told me I had cancer, he is not licensed to treat or diagnose." (Id., pp. 7 - 8.) Plaintiff alleges that Blankenship altered the "biopsy report by scratching out the name on the report and hand writing my first name."[11] (Id., p. 8.) Next, Plaintiff states that Defendant Rehburg submitted "my biopsy tissue under another name, other than my own." (Id.) Finally, Plaintiff alleges that Defendant Callaway and Rehburg acted with deliberate indifference by failing to timely inform her of the biopsy results. (Id., p. 2.)

Based upon a review of the record, it appears that Plaintiff arrived at FPC Alderson on October 20, 2006. (Document No. 37-4, p. 13.) Plaintiff went to sick call on October 24, 2006, where she requested medication for her chronic conditions and reported possible skin cancer on her face.[12] (Id., p. 11.) Nurse Piner noted that Plaintiff's medication was "available for pick up" and she "will see a provider within two weeks." (Id., p. 10.) On October 25, 2006, Defendant Basham-Callaway  documented that Plaintiff suffered from the following: Hepatitis C, hypertension, heart murmur, asthma, depression, chronic low back pain, hyperglycemia, and a lesion of unknown malignant potential. (Id., p. 9.) Defendant Basham-Callaway noted that she was referring Plaintiff to Defendant Rehburg for a biopsy. (Id.) On November 1, 2006, Defendant Rehburg evaluated Plaintiff concerning the lesion on her upper lip. (Id., pp. 4 - 5.) Plaintiff informed Defendant Rehburg that she first noticed the lesion a year and a half ago (March, 2005). (Id., p. 4.) Plaintiff advised Defendant Rehburg that she had been on numerous antibiotics and antivirals and the lesion

---

[11]   Plaintiff contends that Defendant Blankenship acted with deliberate indifference by crossing out the name "Arneal Witherspoon" and hand writing the name Rosalynn on the biopsy report. (Document No. 43, pp. 2 - 3.)

[12]   It was noted that Plaintiff had a history of hypertension, asthma, cardiac disease, and liver disease. (Document No. 37-4, p. 11.)

continued to grow. (Id.) Plaintiff acknowledged that the lesion was there prior to any incarceration and that she had been offered a biopsy just prior to her incarceration. (Id.) Defendant Rehburg then performed a punch biopsy and sutured the area. (Id., p. 5.) Defendant Rehburg noted that the diagnosis was questionable basal cell carcinoma of the upper lip. (Id.) On November 8, 2006, Defendant Rehburg removed the sutures without difficulty. (Id., p. 1.) On November 9, 2006, the pathology report on the biopsy revealed "deeply infiltrating basal cell carcinoma [with] all margins involved." (Document No. 37-3, p. 42 and Document No. 37-4, p. 35.) On November 11, 2006, Plaintiff filed an "Inmate Request to Staff" inquiring as to the result the biopsy. (Document No. 37-4, p. 84.) On November 16, 2006, Teresa Mann replied to Plaintiff's request stating  that Plaintiff should "please come to sick call for an appointment to be scheduled" concerning her biopsy results. (Id.) On November 29, 2006, Plaintiff was evaluated by Defendant Basham-Callaway in the Chronic Care Clinic. (Document No. 37-3, pp. 93 - 94.) Defendant Basham-Callaway ordered a chest x-ray, right knee x-ray, optometry consult, and EKG. (Id., p. 94.) Plaintiff was to follow-up in 90 days regarding chronic care and 2-3 weeks concerning her knee injury.[13] (Id.) On November 30, 2006, Defendant Rehburg wrote a consult request for surgery on Plaintiff's lip. (Document No. 37-4, p. 35.) On December 6, 2006, Heather Ray, Contract Staff, noted that she "[s]poke to inmate about biopsy results [and] reassured her that we were sending her to a specialist in order to get her taken care of." (Document No. 37-3, p. 90.) By letter dated December 21, 2006, Dr. David A. Blaine, Mountain State ENT and Facial Plastic Surgery, stated that Plaintiff had "basal cell carcinoma slowly infiltrating along the upper lip in the junction between the cupids bow and vermillon border." (Document No. 37-4, p. 59.)

The undersigned finds that Defendants did not act with deliberate indifference in diagnosing Plaintiff with basal cell carcinoma. It appears that Plaintiff arrived at FPC Alderson on October 20,

---

[13] It appears that Plaintiff suffered an injury to her knee as a result of a fall at FPC Alderson. (Document No. 37-4, p. 7.)

2006, and she reported the possible skin cancer on October 24, 2006. The following day Plaintiff was examined by Defendant Basham-Callaway, who referred Plaintiff to Defendant Rehburg for a biopsy. Defendant Rehburg performed the punch biopsy on November 1, 2006, seven days after Defendant Basham-Callaway made the referral. On November 9, 2006, the pathology report on the biopsy revealed "deeply infiltrating basal cell carcinoma" with "all margins involved." Plaintiff was informed of the biopsy results on December 6, 2006. Based on the foregoing, it appears that Defendants diagnosed Plaintiff with cancer approximately two weeks after Plaintiff reported the skin lesion on her upper lip. Within three weeks of receiving the pathology report, Defendant Rehburg reviewed the report and submitted a consult request for the surgical removal of the skin cancer. Approximately one month after receipt of the pathology report, Plaintiff was informed of the biopsy results and advised of the treatment plan. Thus, in less than five weeks after Plaintiff reported the skin lesion, Defendants determined that Plaintiff had skin cancer and began making arrangements for the cancer to be surgically removed. Although the pathology report incorrectly stated Plaintiff's first name as "Arneal," there is no indication that the error caused a delay in diagnosing Plaintiff with skin cancer.[14] Moreover, Defendant Blankenship and Rehburg's use of an incorrect name appears to be the result of possible negligence, which cannot support a claim of deliberate indifference. Based on the foregoing, there is no indication that Defendant Blankenship, Basham-Callaway, or Rehburg acted with deliberate indifference in diagnosing the skin cancer on Plaintiff's upper lip.

### B. Plaintiff's claim of deliberate indifference in treating her skin cancer.

Second, Plaintiff asserts that Defendants failed to timely treat her skin cancer. (Document No. 43, p. 7.) Defendants contend Plaintiff received timely and appropriate treatment for her skin cancer. (Document No. 38, pp. 8 - 19.) Defendants state that "[c]ontrary to Plaintiff's allegations,

---

[14] Plaintiff acknowledges that her name was corrected on the medical report during her first visit to Dr. Blaine's office. (Document No. 43, p. 3.)

Dr. Blaine did not recommend surgery 'as soon as possible' after her initial consultation with him." (Id., p. 18.) Defendants explain that the "after the appropriate pre-operative steps were completed, including the medical clearance from the cardiologist, she was scheduled for surgery." (Id.) Thus, Defendants argue that Plaintiff's "initial surgery was appropriately delayed by the need for a cardiac evaluation due to a history of heart murmur as well as the recommendations for an antibiotic regiment." (Id.) In Response, Plaintiff claims that Defendants improperly delayed her surgery. (Document No. 43, p. 4.) Plaintiff alleges that her appointment with Dr. Blaine was scheduled under the wrong name. (Id.)  Next, Plaintiff alleges that in late December, 2006, she was evaluated by Dr. Blaine, who "suggested that [the surgery to remove the skin cancer] be done as soon as possible after the New Year." (Id., p. 4.) Plaintiff states that her surgery did not occur for approximately three months. (Id., p. 4.)

Based on a review of the record, Defendant Rehburg wrote a consult request on November 30, 2006, regarding the surgical removal of Plaintiff's skin cancer. (Document No. 37-4, p. 35.) By letter dated December 21, 2006, Dr. David A. Blaine, Mountain State ENT and Facial Plastic Surgery, stated that Plaintiff had "basal cell carcinoma slowly infiltrating along the upper lip in the junction between the cupids bow and vermillon border." (Id., p. 59.) Dr. Blaine indicated that the "rest of her exam in terms of head and neck was unremarkable" and her "ears, nose and oral cavity as well as neck was clear of disease." (Id.) Regarding Plaintiff's basal cell carcinoma, Dr. Blaine recommended an "excisional biopsy with either direct closure or possible karapandzic flaps to create a complex closure." (Id.) Dr. Blaine further recommended a "frozen section since this does appear to be infiltrating in a deep fashion." (Id.) Dr. Blaine noted that "[g]iven Dr. Paine's cosmetic and facial plastic expertise, I am going to have him consult along with me and would like to have him look into excising and reconstructing this area." (Id.) Dr. Blaine stated Plaintiff should "follow-up for a pre-op" and he needed "medical clearance since she does have a heart murmur and would appreciate recommendations for antibiotic regimen prior to any type of surgery." (Id.)

24

On January 22, 2007, Plaintiff was evaluated by Defendant Basham-Callaway. (Document No. 37-3, p. 79.) Defendant Basham-Callaway noted that Plaintiff was to be referred back to Dr. Paine for removal of the basal cell carcinoma. (Id.) On February 2, 2007, Plaintiff was evaluated by an outside cardiologist, Dr. Von Dohlan, pursuant to Dr. Blaine's request that Plaintiff be cleared by a cardiologist prior to surgery. (Document No. 37-3, p. 77 and Document No. 37-4, pp. 57 - 59.) Dr. VonDolen performed a stress test based upon Plaintiff's history of a heart murmur. (Id.) On March 20, 2007, Charlene Kegg, Nurse Practitioner, noted that Plaintiff was very anxious about her upcoming surgery and stated that she "knows she is going out for surgery on 03/29 at 5:30." (Document No. 37-3, p. 70.) On March 28, 2007, Defendant Basham-Callaway noted that Plaintiff was seen for her pre-operative visit concerning her basal cell carcinoma. (Id., pp. 62 - 63, 66.) Plaintiff was prescribed antibiotics and  advised "about surgical risks." (Id., pp. 62 and 66.) It was further noted that Dr. Blaine and Dr. Paine's offices would be contacted regarding post-operative care and accommodations. (Id., p. 62.) On March 29, 2007, Dr. Paine surgically removed the basal cell carcinoma from Plaintiff's upper lip. (Document No. 37-4, pp. 60 - 61, 66.)

The undersigned finds that Defendants did not improperly delay the surgical removal of Plaintiff's skin cancer. Defendants obtained approval for Plaintiff's surgery and arranged for Plaintiff to be examined by Dr. Blaine within six weeks after receiving the pathology report. Although Plaintiff alleges that Dr. Blaine stated that the surgery should occur as soon as possible after the New Year, there is no evidence the Dr. Blaine informed Defendants of such a time requirement. Dr. Blaine, however, did require that Plaintiff have medical clearance from a cardiologist prior to surgery. An appointment with a cardiologist was scheduled by Defendants, and Plaintiff was evaluated by the cardiologist approximately six weeks after Dr. Blaine informed Defendants of the need for medical clearance. Dr. Paine surgically removed the skin cancer from Plaintiff's upper lip within two months after she was evaluated by the cardiologist. The record reveals that Plaintiff's surgery was preformed successfully and without complications. Based on the

25

foregoing, there is no indication that Defendant Blankenship, Basham-Callaway, or Rehburg knew of and disregarded an excessive risk to Plaintiff's health or safety.

### C.      Plaintiff's claim of deliberate indifference in providing follow-up care.

Finally, Plaintiff alleges that Defendants acted with deliberate indifference in providing follow-up care concerning the cancer. Defendants contend that "Plaintiff received continuous treatment and evaluation for her medical condition." (Document No. 38, p. 18.) Defendants state that Plaintiff received "appropriate follow-up visits and additional corrective surgeries up to the point that the medical staff believed that any further surgical procedures would be purely cosmetic." (Id.) In Response, Plaintiff alleges that "post-op care was ignored and not received after the surgeries." (Document No. 43, p. 8.) Plaintiff claims that her "sutures were to be removed on May 7, 2007, [but] FPC Alderson failed to keep this appointment, causing sutures to embed into my skin." (Id., p. 5.) Plaintiff argues that on May 15, 2007, Dr. Paine recommended that Plaintiff continue to see him for post-surgical care, but Defendants failed to comply. (Id., p. 5.) Plaintiff states that "May 15, 2007, was the last visit to [Dr. Paine's] office." (Id.) Plaintiff asserts that she requested an appointment with Dr. Paine because she had tension in her lips and had a "mushroom looking growth." (Id., p. 6.) Plaintiff claims that her request was denied and she was told that Defendant Rehburg would be providing her post-surgical care. (Id.) Plaintiff contends that an appointment with Dr. Paine was approved by the Utilization Review Committee on January 24, 2008, but Defendants failed to schedule an appointment. (Id., pp. 6 - 7.)

A review of the record reveals that Plaintiff returned to FPC Alderson following her surgery and Defendant Rehburg ordered that Plaintiff be provided with three extra pillows and prescribed Toradol, Phenergan, Tylenol 3, and an antibiotic.(Document No. 37-3, p. 65.) The next day, on March 30, 2007, Defendant Rehburg saw Plaintiff for a follow-up examine noting no problems other than Plaintiff having to learn to eat with a minimal oral opening. (Id., p. 64.) Plaintiff was directed to gargle a solution containing half peroxide and half water three times a day, for four weeks. (Id.)

26

On April 1, 2007, Defendant Blankenship noted that Plaintiff "stated that Dr. Paine told her to use antibiotic ointment for 6 weeks on her lips. Spoke with Nichol at Dr. Paine's office today and she states no instructions like that were given." (Id., p. 62.)

On April 3, 2007, Dr. Paine saw Plaintiff for a post-operative examination and noted that "the scar from the cross lip transposition flap is healing well." (Document No. 37-4, pp.77 - 78 and Document No. 43-7, pp. 5 - 7.) Plaintiff reported to Dr. Paine that she was "not really having any problems with the area other than some aching in the jaw." (Document No. 37-4, pp. 77 and Document No. 43-7, p. 5.) It was noted that an appointment should be scheduled in two weeks for the "constriction of the pedicle to check the blood supply" and in two days for "residual suture removal." (Id.) On April 5, 2007, Plaintiff returned to Dr. Paine for a follow-up appointment. (Document No. 37-4, pp. 74 - 76.) Dr. Paine noted that the area was "healing well," the sutures were removed, and a follow-up should be scheduled in two weeks. (Id., p. 76.) On April 13, 2007, Plaintiff reported to Health Services complaining of "pain at suture line under nostrils."(Document No. 37-3, p. 61.) The area was examined and it was noted that the suture line was dry, intact, with no signs of infection or swelling. (Id.) Plaintiff was directed to apply "warm moist heat to area as needed" and to take "[over-the-counter] pain relievers as needed." (Id.) She was further directed to continue coming to the Health Services Unit three times a day for meals. (Id.)

On April 24, 2007, Plaintiff returned to Dr. Paine for a follow-up appointment stating that the area was "really tight and she has some 'bumps' around the area, but no other problems." (Document No. 37-4, pp. 71 - 73.) Dr. Paine noted that the treatment plan was for Plaintiff to have "excision of the pedicle in 2 days." (Id., p. 73.) Dr. Paine performed the corrective procedure on April 26, 2007. (Id., p. 65.) Specifically, Dr. Paine removed "benign tissue at the left lower lip at the junction of the flap and lip." (Id.) Upon returning from her outside appointment with Dr. Paine, it was noted that Plaintiff's "mouth [was] open on both sides [with] the middle of lips still surgically closed." (Document No. 37-3, p. 57.) A nurse cleaned the area with peroxide and applied antibiotic

ointment. (Id.) Plaintiff was then advised to take over-the-counter pain relievers as needed, issued an antibiotic package, and instructed on wound care. (Id.) Medial staff notified Central Dining Hall that Plaintiff required a soft diet and was to continue to eat meals at the Health Services Unit. (Id.) Plaintiff requested the use of oral-swabs and she was provided one oral swab to clean her mouth. (Id.) On April 30, 2007, Plaintiff went to sick call complaining of pain in her lips. (Id., p. 55.) Plaintiff was examined and "instructed to limit speaking [and] communicate with paper and pen." (Id.) On May 1, 2007, Dr. Paine completed the surgical reconstructed Plaintiff's upper and lower lips. (Document No. 37-4, p. 64.) Plaintiff returned to FPC Alderson following the procedure and was instructed "to keep sutures clean and dry, and keep hands off suture line." (Document No. 37-3, p. 54.) The nurse noted that Plaintiff was "smiling and talking" and the three "sutures were intact on upper and lower lips."[15] (Id.) Defendant Rehburg prescribed Tylenol 3 for pain. (Id.)

On May 15, 2007, Dr. Paine saw Plaintiff for a postoperative evaluation noting the status of the problem for which the procedure was done was "completely resolved" and there were no problems related to the procedure. (Document No. 37-4, pp. 68 - 70.) Plaintiff told Dr. Paine that she was "pleased with his results." (Id.) Dr. Paine noted "the prison was told to have [Plaintiff] back in 5 days and had an appointment on [May 8, 2007,] however, they failed to comply with this requirement. The [Plaintiff] does have some nodular areas present and faxil may be used in the future to help with this situation." (Id., p. 70.) Dr. Paine documented that Plaintiff's sutures from May 1, 2007, were removed without complaints of pain, no bleeding occurred, and the incision was intact. (Id.) Finally, Dr. Paine stated that a follow-up should be scheduled in one month. (Id.) Plaintiff returned to FPC Alderson following her appointment with Dr. Paine and reported a pain scale of 0. (Document No. 37-3, p. 52.)

On May 21, 2007, Plaintiff informed Defendant Basham-Callaway that "she feels like her

---

[15]  The nurse noted that the "recommendations from off site doctor [were] referred to Dr. Callaway." (Document No. 37-3, p. 54.)

upper lip on the left is embedded into the bone." (Id., p. 51.) Defendant Basham-Callaway noted that Plaintiff had "mild scarring from surgery" and "a piece of suture was noted on the left side of inferior lip." (Id.) Defendant Basham-Callaway directed Plaintiff to rinse with water, saltwater, or Listerine, and follow-up in three to four weeks. (Id.) Additionally, Defendant Basham-Callaway submitted a Consultation Sheet on May 21, 2007, requesting plastic surgery "for scar revision of lip where her cancer was removed." (Document No. 37-4, p. 55.) Defendant Rehburg subsequently denied Defendant Basham-Callaway's request because the surgery was considered cosmetic. (Id.)

On June 21, 2007, Defendant Basham-Callaway saw Plaintiff for a follow-up concerning her surgery. (Document No. 37-3, p. 48.) Plaintiff reported that she felt a "pinching sensation in her upper lip." Defendant Basham-Callaway noted that the "incisions sites are clear, edges well-approximated" and the area "looks good." (Id.) Defendant Basham-Callaway completed a Consultation Sheet concerning Plaintiff's request to see Dr. Paine regarding the "pinching sensation in her upper lip." (Document No. 43-4, p. 22.) The Consultation Report reveals that an appointment with Defendant Rehburg was scheduled for July 17, 2007. (Id.) On July 17, 2007, Defendant Rehburg examined Plaintiff noting that the "scars look good," tension in the scars is to be expected, a suture knot can be felt in each scar, and a possible fluid collection in the upper lip. (Id.) Defendant Rehburg documented that he called Dr. Paine regarding the possible fluid build up. (Id.) Defendant Rehburg noted that he would see Plaintiff in two to four weeks. (Id.)

On December 18, 2007, Plaintiff reported to sick call complaining of possible cancer on her bicep and lip. (Document No. 37-3, p. 28.) The nurse noted that Plaintiff had a spot under her right bicep and a small lesion with swelling to the right of the scar on her lower lip. (Id.) It was further noted that Plaintiff had two complaints, and the policy requires only one complaint per sick call visit. (Id., p. 22.) Plaintiff's complaint concerning her arm was addressed on the above visit, and she was directed to return to sick call for the lip lesion. (Id.) The matter was referred to Defendant Rehburg due to Plaintiff's history of cancer. (Id.) On December 20, 2007, Plaintiff reported to sick

29

call complaining of possible reoccurring skin cancer on her lip. (Id., pp. 26 - 27.) The nurse noted that there was no swelling and that a provider would evaluate Plaintiff within a couple of weeks. (Id., p. 27.) On January 3, 2008, Plaintiff reported to Health Services where she was evaluated by Dana Renick, Physician Assistant, and Defendant Rehburg. (Id., p. 24.) Plaintiff indicated that she believed her skin cancer was reoccurring and complained that she had never had a surgical follow-up. (Id.) It was noted that Plaintiff had some tissue changes of 8 mm to 1 cm from the surgical scar, and "depigmentation of the lip line lateral from the mouth on left side." (Id.) Based on Plaintiff's continued complaint of pain in her arm, Defendant Rehburg ordered an x-ray of her right arm to be followed by an MRI. (Id.) It was further noted a consult would be made with the Utilization Review Committee "for a post-op surgical follow-up." (Id.)

On January 15, 2008, Physician Assistant Renick noted that Plaintiff reported at the Chronic Care Center, "but needs to see physician." (Id., p. 25.) Physician Assistant Renick also noted that she submitted a second consult to the Utilization Review Committee "for post-op check." (Id.) On January 24, 2008, the Utilization Review Committee approved the request for an appointment with Dr. Paine. (Document No. 43-2, p. 2.) On February 12, 2008, Plaintiff was evaluated by Defendant Rehburg in the Chronic Care Center. (Id., p. 13.) Defendant Rehburg noted that Plaintiff's upper and lower lips "looks good" with "minimal scarring,""good lip mobility," and "no new growth currently showing." (Id.) Plaintiff did not report any further complaints concerning her lip prior to her release from custody in September, 2008.

Based on the foregoing, the undersigned finds there is no evidence that Defendants acted with deliberate indifference regarding Plaintiff's post-operative care. Plaintiff had four appointments with Dr. Paine following the removal of her skin cancer. Although it appears that Defendants failed to comply with Dr. Paine's recommendation for Plaintiff to be examined within one week of her reconstructive surgery, Defendants did arrange for Plaintiff to be examined by Dr. Paine within two weeks of the reconstructive surgery. Even though Plaintiff's follow-up appointment was delayed by

a week, Dr. Paine noted that Plaintiff's sutures were removed without complications and there were

no problems related to the procedure. It appears that Defendant Rehburg and Defendant Basham-

Callaway administered Plaintiff's remaining follow-up care. Plaintiff was evaluated by Defendant

Rehburg and Defendant Basham-Callaway approximately nine times concerning her lip after the

surgical removal of the skin cancer. Defendant Basham-Callaway sought approval for plastic surgery

concerning the scar on Plaintiff's lip, but the request was denied because the plastic surgery was

determined to be cosmetic. When Plaintiff reported that Dr. Paine had directed the use of antibiotic

ointment on her lips for six weeks, Defendant Blankenship contacted Dr. Paine's office and verified

that Dr. Paine made no such recommendation. When Plaintiff complained of a fluid build up in her

lip, Defendant Rehburg examined Plaintiff and consulted with Dr. Paine. Additionally, when

Plaintiff reported the possibility of reoccurring cancer on her lip, Defendant Rehburg sought and

received approval for Plaintiff to be examined by Dr. Paine.[16] The record reveals that Plaintiff

received timely treatment of the skin cancer on her lip and continuous follow-up care following the

surgeries. Plaintiff's skin cancer was successfully treated and Plaintiff is cancer free. There is no

evidence that Defendants' alleged failure to follow Dr. Paine's treatment plan resulted in the

disfigurement of her face. Plaintiff's complaint that Defendants failed to correct the alleged

deformity of her lip does not state a claim of deliberate indifference to a serious medical condition.

See Belcher v. White, 2001 WL 34610443 (W.D.N.C. Jun. 6, 2001)(denying plaintiff's claim of

deliberate indifference where the complaint was based upon the fact that plaintiff was denied

---

[16] It is unclear from the record whether Plaintiff was examined by Dr. Paine following the approval of the appointment by the Utilization Review Committee in January, 2008. The record reveals that in February, 2008, Plaintiff was evaluated by Defendant Rehburg, who determined that Plaintiff's lip "looked good" and there were "no new growth currently showing." If the appointment with Dr. Paine did not occur, there is no evidence that Defendants knew of and failed to schedule an appointment with Dr. Paine. Plaintiff does not allege that she notified Defendants that the appointment did not occur. Although Plaintiff continued to seek treatment for her other medical conditions upon until her release from custody, she failed to report any further complains concerning her lip.

31

requested dental work that was cosmetic in nature). The record is void of any evidence indicating that the plastic surgery was medically necessary. If anything, Plaintiff simply disagrees with Defendants' treatment of her medical conditions. Plaintiff's belief that further surgery, or other treatment, should have been provided does not establish deliberate indifference on the part of prison staff, as disagreements over the appropriate course of treatment do not rise to the level of a constitutional violation. See Buckner v. Warden, Eastern Correctional Inst., 989 F.2d 491 (4th Cir. 1993)(unpublished opinion)(finding that plaintiff's disagreement that surgery of his lip was cosmetic failed to establish a claim of deliberate indifference even though plaintiff alleged that surgery was necessary because "food falls back out of my mouth and it is hard for me to speak and/or articulate"); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)(inmate and physician's disagreement over proper medical care does not state a constitutional claim unless exceptional circumstances are alleged); Johnson v. Vo, 2005 WL 1388574 (E.D.Cal. Jun. 10, 2005)(finding that plaintiff's disagreement that the removal of the lipoma was cosmetic did not constitute cruel and unusual punishment in violation of the constitution). Accordingly, there is no indication that Defendant Blankenship, Basham-Callaway, or Rehburg acted with deliberate indifference in providing follow-up care following the successful removal of Plaintiff's skin cancer. The undersigned, therefore, finds it unnecessary to consider the other reasons which Defendants Blankenship, Basham-Callaway, and Rehburg have submitted for dismissal.

### D.    Plaintiff's claim against Defendants Hickey and Lowe.

Plaintiff alleges that Defendants Hickey and Lowe violated her constitutional rights by "allowing correctional officers of the prison to alter records and make appointments under altered false names" and "for not seeing to my medical needs." (Document No. 43, p. 8.)

Defendants Hickey and Lowe contend that they are entitled to summary judgment because Plaintiff's claims against them are improperly raised under the doctrine of *respondeat superior*. (Document No. 38, pp. 20 - 21.) Defendants argue that "Plaintiff fails to show that Defendants

Hickey and Lowe had direct involvement in any subordinate's actions." (Id., p. 20.) Specifically, Defendants assert that "[t]heir supervisory positions and the general notion that they are responsible for the actions of their subordinates are legally insufficient to form the basis of a claim for a constitutional violation." (Id., pp. 20 - 21.)   In support, Defendants Hickey and Lowe filed declarations. (Document Nos. 37-5. And 37-6.) Defendants Hickey and Lowe declare that during their tenure at FPC Alderson, they were not personally involved in the medical decisions regarding the medical care of inmate Witherspoon or any other inmate. (Id.) Defendants Hickey and Lowe explain that they "relied upon the judgment of trained medical staff to provide medical care for the inmates." (Id.) Defendant Hickey states that she did not sign any of Plaintiff's administrative remedy responses because Plaintiff's requests were filed after she left FPC Alderson. (Document No. 37-5.) Defendant Lowe states that she "did sign as Acting Warden a response to an administrative remedy request filed by inmate Witherspoon." (Document No. 37-6.)

Liability under the doctrine of *respondeat superior* is generally inapplicable to actions arising under 42 U.S.C. § 1983. See Monell v. Department of Social Services of the City of NY, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability, however, may attach to a supervisory official if "conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the official] could be liable." Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by* County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Further, supervisory officials may be liable for acts of their subordinates where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative fact in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984). Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly, obdurately, or with deliberate

indifference to the pervasive risk of harm." <u>Moore v. Winebrenner</u>, 927 F.2d 1312, 1315 (4th Cir. 1991).

Defendants Hickey and Lowe argue that Plaintiff has failed to demonstrate specifically how they were personally involved in violating any of Plaintiff's constitutional rights. Essentially, Plaintiff alleges that Defendants Hickey and Lowe violated her constitutional rights with respect to their failure to supervise employees and in responding to her administrative remedies. The evidence of record reveals that Defendant Lowe did respond to an administrative remedy request filed by Plaintiff. (Document No. 43-6, p. 11.) Plaintiff, however, has shown no other personal involvement by Defendant Lowe, and the record does not indicate any personal involvement by Defendant Hickey.[17] The dismissal of a non-medical defendant is appropriate where the defendant's sole involvement is the denial of an administrative remedy request. <u>See</u> <u>Fellove v. Heady</u>, 2008 WL 196420 *4 (N.D.W.Va. Jan. 22, 2008)(stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state *Bivens* claim"); <u>Mabry v. Ramirez</u>, 2007 WL 4190398 *6 (N.D.W.Va. Nov. 21, 2007)(holding that "denying a prisoner's institutional grievance is not the type of personal involvement required to state a *Bivens* claim for deliberate indifference to serious medical needs"); <u>Paige v. Kupec</u>, 2003 WL 23274357 *1 (D.Md. March 31, 2003), <u>aff'd</u>, 70 Fed. Appx. 147 (4th Cir. 2003)(finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy). In order to succeed on a medical claim against non-medical personnel, plaintiff must establish that non-medical personnel were personally

---

[17]   Defendant Hickey left the prison prior to Plaintiff filing an administrative remedy involving the above claim.

involved in a denial of treatment, deliberately interfered with treatment, or tacitly authorized or were indifferent to a prison physician's conduct. Lewis v. Angelone, 926 F. Supp. 69, 73 (W.D.Va. 1996). Non-medical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. Miltier v. Born, 896 F.2d 848, 854 - 55 (4th Cir. 1990). The record reveals that Defendants Hickey and Lowe were not aware of Plaintiff's complaint that medical staff used an incorrect name or had altered medical records. Further, there is no evidence that the incorrect use of Plaintiff's first name delayed or negatively altered the medical treatment provided to Plaintiff. Finally, there is no evidence that Defendants Hickey or Lowe were personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment, or tacitly authorized the prison physicians' conduct. Accordingly, Plaintiff has improperly raised her claim against Defendants Hickey and Lowe under the doctrine of *respondeat superior* and has failed to establish supervisory liability. The Court therefore finds that Defendants Hickey and Lowe's Motion for Summary Judgment should be granted. The undersigned finds it unnecessary to consider the other reasons which the Defendants Hickey and Lowe have submitted for dismissal.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT** Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment. (Document No. 37.), **DISMISS** Plaintiff's Complaint (Document No.1.) and remove this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant

to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(e) of the Federal Rules of Criminal Procedure, the parties shall have seventeen (17) days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of these Findings and Recommendation within which to file with the Clerk of this Court, written objections, identifying the portions of the Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208, 104 S. Ct. 2395, 81 L. Ed. 2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Petitioner, who is acting *pro se*, and transmit a copy to counsel of record.

Date: July 8, 2010.

R. Clarke VanDervort
United States Magistrate Judge