**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **ROSALYNN CROSS WITHERSPOON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:07-0802** |
| | ) | |
| **UNITED STATES OF AMERICA, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending are the following Motions: (1) The United States' Motion to Dismiss (Document No. 61.), filed on October 14, 2010; and (2) Defendants Hickey, Lowe, Blankenship, Rehberg, and Basham-Callaway's Motion to Dismiss, or in the Alternative Motion for Summary Judgment (Document No. 67.), filed on November 5, 2010. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to the United States and Defendants' Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting her claims as they are challenged by the United States and Defendants in moving to dismiss. (Document Nos. 63 and 69.) Plaintiff has filed Responses to the United States and Defendants' Motions. (Document No. 70 and 71.) Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court grant the United States' Motion to Dismiss and Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment.

**PROCEDURAL HISTORY**

On December 10, 2007, Plaintiff, then an inmate incarcerated at FCI Alderson, located in Alderson, West Virginia, and acting *pro se*, filed a Complaint and an Application to Proceed Without

Prepayment of Fees and Affidavit.[1] (Document Nos. 1 and 2.) Plaintiff names the following as Defendants: (1) United States of America; (2) Debra Hickey, former Warden of FPC Alderson; (3) Alice Lowe, Assistant Warden; (4) James Blankenship, Health Service Administrator; (5) Dr. Neal Rehberg, Clinical Director; and (6) Dr. Callaway. (Document No. 1.) Plaintiff alleges that Defendants failed to provide adequate medical care concerning the treatment of her skin cancer. Plaintiff asserts that on November 1, 2006, Dr. Rehberg performed a biopsy on two spots on Plaintiff's lip. Plaintiff claims she did not receive the biopsy results until December 6, 2006. On December 6, 2006, Plaintiff was informed that she had basal cell carcinoma, a form of skin cancer.[2] Plaintiff was transported on December 21, 2006, to Dr. Paine's office for an evaluation. Plaintiff states that Dr. Paine recommended surgery "as soon as possible." Plaintiff alleges that the skin cancer on her lip was not surgically removed until March 29, 2007. As a result of the surgery, Plaintiff states that her mouth was "sewn shut" for a month and a half. During this time period, Plaintiff asserts that she was forced to consume only liquids. Plaintiff contends that Defendants provided liquids that contained inadequate nutrition. On May 1, 2007, Plaintiff was transported to Dr. Paine's office for a cosmetic procedure to "revise some of the lip to get it the right thickness." Plaintiff was transported back to Dr. Paine's office on May 15, 2007, to have sutures removed that allegedly "grew into [her] face" as a result of prison officials missing a scheduled appointment. Plaintiff argues that Defendants failed to timely treat her skin cancer and comply with Dr. Paine's treatment plan, which resulted in the "disfigurement of [her] face." Plaintiff states that there is a "blood pool formation now grown inside the graft and having nodules, which pull and cause tension in my lip." Plaintiff asserts that she was

---

[1] Because Plaintiff is acting *pro se*, the documents which she has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

[2] Basal cell carcinoma is one of the most common forms of skin cancer.

last evaluated by Dr. Paine on May 15, 2007. Finally, Plaintiff alleges that she is experiencing problems with her teeth and gums as a result of the lack of proper dental care during the period of time that her mouth was "sewn shut." Plaintiff requests compensatory damages and "for [her] face [and teeth] be repaired."[3]

By Order entered on August 28, 2009, the undersigned granted Plaintiff's Application to Proceeding Without Prepayment of Fees. (Document No. 7.) In screening Plaintiff's Complaint, the undersigned determined that Plaintiff had potentially stated a claim under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 395 -97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but failed to state a claim under the Federal Tort Claims Act [FTCA], 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2671, et seq.[4] (Id.) On January 4, 2010, Defendants filed a Motion to Dismiss for Insufficient Service of Process. (Document No. 29.) Plaintiff filed her Response on January 11, 2010. (Document No. 32.) By Order entered on January 14, 2010, the undersigned denied Defendants' Motion to Dismiss for Insufficient Service of Process as moot and ordered that Defendants file a Response to Plaintiff's Complaint within sixty days of January 11, 2010. (Document No. 34.)

On January 26, 2010, Defendants filed their Motion to Dismiss, or in the Alternative Motion for Summary Judgment and Memorandum in Support. (Document Nos. 37 and 38.) On February 2, 2010, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff,

---

[3] Although Plaintiff indicates in her Complaint that she has a civil action pending in the Northern District of West Virginia involving the same facts as stated above, the undersigned finds that the only case filed by Plaintiff in the Northern District involved a claim of excessive force by prison officials. *Witherspoon v. North Central Regional Jail, et al.*, 1:05-cv-0029 (N.D.W.Va. Apr. 25, 2006).

[4] The undersigned instructed Plaintiff to notify the Court if her intent was to file an action against the United States pursuant to the FTCA. (Document No. 7, p. 4.)

advising her of the right to file a response to the Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment. (Document No. 39.) On April 1, 2010, Plaintiff filed her Response. (Document No. 43.) In her Response, Plaintiff stated that she tested positive for H. Pylori in April, 2007, which "was caused by problems with my stomach and possible lack of solid nourishment." (Id., p. 6.) On April 2, 2010, the Defendants filed their Reply. (Document No. 44.) Defendants acknowledged that "plaintiff now seeks to have the defendants responsible for all her medical problems, including H. Pylori," but argued that the medical records "establish that these conditions are unrelated to her lip cancer surgery during the time that she was incarcerated at FPC Alderson." (Id.) Also on April 2, 2010, Plaintiff filed an "Amendment for Response Due April 2, 2010, to Add Attachment # 6." (Document No. 45.) Plaintiff attached Exhibit No. 6, which "includes the administrative remedies for the H. Pylori and the responses received from administration." (Id.) On April 9, 2010, Plaintiff filed a Motion for Leave to File Surreply Response (Document No. 46.) and her Surreply (Document No. 46-1.). In her Surreply, Plaintiff states that "I do know I established H pylori during the treatment of the cancer and still HAVE it to date." (Id.) On April 12, 2010, Defendant Blankenship filed a Notice of Supplemental Authority. (Document No. 47.) Also on April 12, 2010, Defendants filed their Response in Opposition to Plaintiff's Motion for Surreply. (Document No. 48.) By Order entered on July 8, 2010, the undersigned granted Plaintiff's Motion for Leave to File a Surreply. (Document No. 49.)

By Proposed Findings and Recommendation also entered on July 8, 2010, the undersigned recommended that Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment be granted and Plaintiff's Complaint be dismissed. (Document No. 51.) On August 10, 2010, Plaintiff filed her Objections. (Document No. 55.) Concerning her H. Pylori and FTCA claims, Plaintiff objected as follows:

6)      I did contract H-Pylori during this time. As submitted, with administrative remedies. There was delay in treatment of this disease.

7)      I did exhaust all administrative remedies for H-Pylori.

8)      According to a Government Agency National, Digestive Diseases Information Clearinghouse in Bethesda Maryland, H-Pylori comes from or through food or water. Also, through infected people. FPC Alderson having infected people, persons infected one being Cheryl Vandervender, both were housed in the same unit as plaintiff, within fifteen feet.

\* \* \*

18)     A Tort Claim was filed under the Federal Tort Claim Act, 28 U.S.C. 2671. My Tort Claim number is TRT-MXR-2007-02443.

(Id., pp. 2 and 4.) By Memorandum Opinion and Order entered on September 27, 2010, United States District Judge David A. Faber referred the matter back to the undersigned for reconsideration of Plaintiff's (1) H. Pylori claim, and (2) FTCA claim. (Document No. 56.) Specifically, Judge Faber stated that the matter was referred back to the undersigned for a determination as to (1) "whether plaintiff has exhausted her claim regarding H. Pylori and for a recommendation regarding disposition" (Id., p. 9.), and (2) whether "plaintiff is pursuing relief under the FTCA in this lawsuit and, if so, whether she should be permitted to do so." (Id., p. 10.) By Order entered on October 4, 2010, the undersigned directed Defendants Hickey, Lowe, Rehberg, Basham-Callaway, and Blankenship to file a Response to Plaintiff's H. Pylori claim and the United States to file a Response to Plaintiff's FTCA claim.

On October 14, 2010, the United States filed a Motion to Dismiss and Memorandum in Support. (Document Nos. 61 and 62.) The United States argues that Plaintiff's Complaint should be dismissed because Plaintiff failed to file a screening certificate of merit as required by the West Virginia Medical Professional Liability Act [MPLA]. (Document No. 62, pp. 3 - 5.) In support, the United States attaches as Exhibits: (1) A copy of Plaintiff's "Claim for Damage Injury, or Death"

5

dated November 1, 2006 (Document No. 61-1, pp. 1 - 2.); and (2) A copy of the United States Department of Justice's denial letter dated June 12, 2007, regarding Tort Claim No. TRT-MXR-2007-02443 (Id., pp. 3 - 4.). Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff advising her of the right to file a response to the United States' Motion to Dismiss. (Document No. 63.) On November 29, 2010, Plaintiff filed her Response to United States' Motion to Dismiss. (Document No. 70.) Plaintiff first contends that prison officials had knowledge that other inmates were infected with H. Pylori and negligently allowed Plaintiff to come into contact with those individuals. (Id., pp. 4 - 5, 7.) Next, Plaintiff continues to argue that Defendants acted with negligence in providing medical treatment for the cancer on her upper lip and proper follow-up care. (Id., pp. 5 - 6.) Finally, Plaintiff alleges that Defendants' "incompetency is plain to see." (Id., p. 7.)

On November 5, 2010, Defendants filed a Motion to Dismiss, or in the Alternative Motion for Summary Judgment and Memorandum in Support. (Document Nos. 67 and 68.) Defendants argue that Plaintiff's Complaint should be dismissed based on the following: (1) "Plaintiff failed to properly exhaust administrative remedies on the H. Pylori claim" (Document No. 68, p. 2, fn. 2); (2) "Plaintiff's lack of specificity against Defendants" (Id.); (3) "Plaintiff cannot establish a claim for deliberate indifference to a serious medical condition" (Id., pp. 3 - 10.); and (4) "The Defendants are entitled to qualified immunity." (Id., pp. 10 - 17.) In support, Defendants attach the following Exhibits: (1) The "Second Declaration of Sharon Wahl" (Document No. 67-1.); and (2) The "Second Declaration of Neal Rehberg" (Document No. 67-2.). Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff advising her of the right to file a response to the Defendants' Motion to Dismiss. (Document No. 69.)

On December 1, 2010, Plaintiff filed her Response to Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment. (Document No. 71.) First, Plaintiff contends that she

contracted H. Pylori during her incarceration at Alderson and "there was delay in my treatment for this disease." (Id., p. 2.) Second, Plaintiff asserts that she "did exhaust all administrative remedies for H-Pylori." (Id.) Third, Plaintiff argues that Defendant Hickey acted with negligence "by having my housing with other inmates who were already infected with H-Pylori." (Id., p. 1.) Specifically, Plaintiff states that Defendant Hickey had "knowledge of this bacterium on the compound and from other infected inmates, but [failed] to protect me or inmates not infected with preventative measures to avoid contamination to this bacterium H-Pylori."[5] (Id.) Fourth, Plaintiff alleges that "[r]esponding to BP9's about specifically the H-Pylori and not taking the full protective or preventative measures when fully aware of all medical issues already present shows lack of responsibility for administrative staff." (Id., p. 2.) Fifth, Plaintiff alleges that "medical care is the responsibility of Blankenship, Callaway, and Rehberg, who were the senior acting representative to my needs." (Id., p. 3.) Finally, Plaintiff claims that Defendants were aware that she was receiving inadequate medical treatment based upon her "continued returns to sick call and repeated complaints of the symptoms and painful effects results from the H-Pylori." (Id., p. 3.)

## FACTUAL HISTORY

Medical Treatment for Skin Cancer:

Based upon a review of the record, it appears that Plaintiff arrived at FPC Alderson on October 20, 2006. (Document No. 37-4, p. 13.) Plaintiff went to sick call on October 24, 2006, where she requested medication for her chronic conditions and reported possible skin cancer on her face.[6]

---

[5] The undersigned notes that the record is void of any evidence that Plaintiff exhausted her claim that Defendants' conduct resulted in her contracting H. Pylori. Plaintiff, however, filed administrative remedies concerning her claim that Defendants failed to provide adequate medical treatment for her H. Pylori (Remedy Id. 464863). (Document Nos. 45-1 and 67-1.)

[6] It was noted that Plaintiff had a history of hypertension, asthma, cardiac disease, and liver disease. (Document No. 37-4, p. 11.)

(Id., p. 11.) Nurse Piner noted that Plaintiff's medication was "available for pick up" and she "will see a provider within two weeks." (Id., p. 10.) On October 25, 2006, Defendant Basham-Callaway documented that Plaintiff suffered from the following: Hepatitis C, hypertension, heart murmur, asthma, depression, chronic low back pain, hyperglycemia, and a lesion of unknown malignant potential. (Id., p. 9.) Defendant Basham-Callaway noted that she was referring Plaintiff to Defendant Rehberg for a biopsy. (Id.) On November 1, 2006, Defendant Rehberg evaluated Plaintiff concerning the lesion on her upper lip. (Id., pp. 4 - 5.) Plaintiff informed Defendant Rehberg that she first noticed the lesion a year and a half ago (March, 2005). (Id., p. 4.) Plaintiff advised Defendant Rehberg that she had been on numerous antibiotics and antivirals and the lesion continued to grow. (Id.) Plaintiff acknowledged that the lesion was there prior to any incarceration and that she had been offered a biopsy just prior to her incarceration. (Id.) Defendant Rehberg then performed a punch biopsy and sutured the area. (Id., p. 5.) Defendant Rehberg noted that the diagnosis was questionable basal cell carcinoma of the upper lip. (Id.) On November 8, 2006, Defendant Rehberg removed the sutures without difficulty. (Id., p. 1.) On November 9, 2006, the pathology report on the biopsy revealed "deeply infiltrating basal cell carcinoma [with] all margins involved." (Document No. 37-3, p. 42 and Document No. 37-4, p. 35.) On November 11, 2006, Plaintiff filed an "Inmate Request to Staff" inquiring as to the result the biopsy. (Document No. 37-4, p. 84.) On November 16, 2006, Teresa Mann replied to Plaintiff's request stating that Plaintiff should "please come to sick call for an appointment to be scheduled" concerning her biopsy results. (Id.) On November 29, 2006, Plaintiff was evaluated by Defendant Basham-Callaway in the Chronic Care Clinic. (Document No. 37-3, pp. 93 - 94.) Defendant Basham-Callaway ordered a chest x-ray, right knee x-ray, optometry consult, and EKG. (Id., p. 94.) Plaintiff was to follow-up in 90 days regarding chronic care and 2-3 weeks

concerning her knee injury.[7] (Id.) On November 30, 2006, Defendant Rehberg wrote a consult request

for surgery on Plaintiff's lip. (Document No. 37-4, p. 35.) On December 6, 2006, Heather Ray,

Contract Staff, noted that she "[s]poke to inmate about biopsy results [and] reassured her that we

were sending her to a specialist in order to get her taken care of." (Document No. 37-3, p. 90.)

By letter dated December 21, 2006, Dr. David A. Blaine, Mountain State ENT and Facial

Plastic Surgery, stated that Plaintiff had "basal cell carcinoma slowly infiltrating along the upper lip

in the junction between the cupids bow and vermillon border." (Document No. 37-4, p. 59.) Dr.

Blaine indicated that the "rest of her exam in terms of head and neck was unremarkable" and her

"ears, nose and oral cavity as well as neck was clear of disease." (Id.) Regarding Plaintiff's basal cell

carcinoma, Dr. Blaine recommended an "excisional biopsy with either direct closure or possible

karapandzic flaps to create a complex closure." (Id.) Dr. Blaine further recommended a "frozen

section since this does appear to be infiltrating in a deep fashion." (Id.) Dr. Blaine noted that "[g]iven

Dr. Paine's cosmetic and facial plastic expertise, I am going to have him consult along with me and

would like to have him look into excising and reconstructing this area." (Id.) Dr. Blaine stated

Plaintiff should "follow-up for a pre-op" and he needed "medical clearance since she does have a

heart murmur and would appreciate recommendations for antibiotic regimen prior to any type of

surgery." (Id.)

On January 22, 2007, Plaintiff was evaluated by Defendant Basham-Callaway. (Document

No. 37-3, p. 79.) Defendant Basham-Callaway noted that Plaintiff was to be referred back to Dr.

Paine for removal of the basal cell carcinoma. (Id.) On February 2, 2007, Plaintiff was evaluated by

an outside cardiologist, Dr. Von Dohlan, pursuant to Dr. Blaine's request that Plaintiff be cleared by

---

[7] It appears that Plaintiff suffered an injury to her knee as a result of a fall at FPC Alderson.
(Document No. 37-4, p. 7.)

a cardiologist prior to surgery. (Document No. 37-3, p. 77 and Document No. 37-4, pp. 57 - 59.) Dr. VonDolen performed a stress test based upon Plaintiff's history of a heart murmur. (Id.) On March 20, 2007, Charlene Kegg, Nurse Practitioner, noted that Plaintiff was very anxious about her upcoming surgery and stated that she "knows she is going out for surgery on 03/29 at 5:30." (Document No. 37-3, p. 70.) On March 28, 2007, Defendant Basham-Callaway noted that Plaintiff was seen for her pre-operative visit concerning her basal cell carcinoma. (Id., pp. 62 - 63, 66.) Plaintiff was prescribed antibiotics and advised "about surgical risks." (Id., pp. 62 and 66.) It was further noted that Dr. Blaine and Dr. Paine's offices would be contacted regarding post-operative care and accommodations. (Id., p. 62.) On March 29, 2007, Dr. Paine surgically removed the basal cell carcinoma from Plaintiff's upper lip. (Document No. 37-4, pp. 60 - 61, 66.)

Plaintiff returned to FPC Alderson following her surgery and Defendant Rehberg ordered that Plaintiff be provided with three extra pillows and prescribed Toradol, Phenergan, Tylenol 3, and an antibiotic.(Document No. 37-3, p. 65.) The next day, on March 30, 2007, Defendant Rehberg saw Plaintiff for a follow-up examine noting no problems other than Plaintiff having to learn to eat with a minimal oral opening. (Id., p. 64.) Plaintiff was directed to gargle a solution containing half peroxide and half water three times a day, for four weeks. (Id.) On April 1, 2007, Defendant Blankenship noted that Plaintiff "stated that Dr. Paine told her to use antibiotic ointment for 6 weeks on her lips. Spoke with Nichol at Dr. Paine's office today and she states no instructions like that were given." (Id., p. 62.)

On April 3, 2007, Dr. Paine saw Plaintiff for a post-operative examination and noted that "the scar from the cross lip transposition flap is healing well." (Document No. 37-4, pp.77 - 78 and Document No. 43-7, pp. 5 - 7.) Plaintiff reported to Dr. Paine that she was "not really having any problems with the area other than some aching in the jaw." (Document No. 37-4, pp. 77 and

Document No. 43-7, p. 5.) It was noted that an appointment should be scheduled in two weeks for the "constriction of the pedicle to check the blood supply" and in two days for "residual suture removal." (<u>Id.</u>) On April 5, 2007, Plaintiff returned to Dr. Paine for a follow-up appointment. (Document No. 37-4, pp. 74 - 76.) Dr. Paine noted that the area was "healing well," the sutures were removed, and a follow-up should be scheduled in two weeks. (<u>Id.</u>, p. 76.) On April 13, 2007, Plaintiff reported to Health Services complaining of "pain at suture line under nostrils."(Document No. 37-3, p. 61.) The area was examined and it was noted that the suture line was dry, intact, with no signs of infection or swelling. (<u>Id.</u>) Plaintiff was directed to apply "warm moist heat to area as needed" and to take "[over-the-counter] pain relievers as needed." (<u>Id.</u>) She was further directed to continue coming to the Health Services Unit three times a day for meals. (<u>Id.</u>)

On April 24, 2007, Plaintiff returned to Dr. Paine for a follow-up appointment stating that the area was "really tight and she has some 'bumps' around the area, but no other problems." (Document No. 37-4, pp. 71 - 73.) Dr. Paine noted that the treatment plan was for Plaintiff to have "excision of the pedicle in 2 days." (<u>Id.</u>, p. 73.) Dr. Paine performed the corrective procedure on April 26, 2007. (<u>Id.</u>, p. 65.) Specifically, Dr. Paine removed "benign tissue at the left lower lip at the junction of the flap and lip." (<u>Id.</u>) Upon returning from her outside appointment with Dr. Paine, it was noted that Plaintiff's "mouth [was] open on both sides [with] the middle of lips still surgically closed." (Document No. 37-3, p. 57.) A nurse cleaned the area with peroxide and applied antibiotic ointment. (<u>Id.</u>) Plaintiff was then advised to take over-the-counter pain relievers as needed, issued an antibiotic package, and instructed on wound care. (<u>Id.</u>) Medial staff notified Central Dining Hall that Plaintiff required a soft diet and was to continue to eat meals at the Health Services Unit. (<u>Id.</u>) Plaintiff requested the use of oral-swabs and she was provided one oral swab to clean her mouth. (<u>Id.</u>) On April 30, 2007, Plaintiff went to sick call complaining of pain in her lips. (<u>Id.</u>, p. 55.) Plaintiff was

11

examined and "instructed to limit speaking [and] communicate with paper and pen." (Id.) On May 1, 2007, Dr. Paine completed the surgical reconstruction of Plaintiff's upper and lower lips. (Document No. 37-4, p. 64.) Plaintiff returned to FPC Alderson following the procedure and was instructed "to keep sutures clean and dry, and keep hands off suture line." (Document No. 37-3, p. 54.) The nurse noted that Plaintiff was "smiling and talking" and the three "sutures were intact on upper and lower lips."[8] (Id.) Defendant Rehberg prescribed Tylenol 3 for pain. (Id.)

On May 15, 2007, Dr. Paine saw Plaintiff for a postoperative evaluation noting the status of the problem for which the procedure was done was "completely resolved" and there were no problems related to the procedure. (Document No. 37-4, pp. 68 - 70.) Plaintiff told Dr. Paine that she was "pleased with his results." (Id.) Dr. Paine noted "the prison was told to have [Plaintiff] back in 5 days and had an appointment on [May 8, 2007,] however, they failed to comply with this requirement. The [Plaintiff] does have some nodular areas present and faxil may be used in the future to help with this situation." (Id., p. 70.) Dr. Paine documented that Plaintiff's sutures from May 1, 2007, were removed without complaints of pain, no bleeding occurred, and the incision was intact. (Id.) Finally, Dr. Paine stated that a follow-up should be scheduled in one month. (Id.) Plaintiff returned to FPC Alderson following her appointment with Dr. Paine and reported a pain scale of 0. (Document No. 37-3, p. 52.)

On May 21, 2007, Plaintiff informed Defendant Basham-Callaway that "she feels like her upper lip on the left is embedded into the bone." (Id., p. 51.) Defendant Basham-Callaway noted that Plaintiff had "mild scarring from surgery" and "a piece of suture was noted on the left side of inferior lip." (Id.) Defendant Basham-Callaway directed Plaintiff to rinse with water, saltwater, or Listerine,

---

[8] The nurse noted that the "recommendations from off site doctor [were] referred to Dr. Callaway." (Document No. 37-3, p. 54.)

and follow-up in three to four weeks. (Id.) Additionally, Defendant Basham-Callaway submitted a Consultation Sheet on May 21, 2007, requesting plastic surgery "for scar revision of lip where her cancer was removed." (Document No. 37-4, p. 55.) Defendant Rehberg subsequently denied Defendant Basham-Callaway's request because the surgery was considered cosmetic. (Id.)

On June 21, 2007, Defendant Basham-Callaway saw Plaintiff for a follow-up concerning her surgery. (Document No. 37-3, p. 48.) Plaintiff reported that she felt a "pinching sensation in her upper lip." Defendant Basham-Callaway noted that the "incisions sites are clear, edges well-approximated" and the area "looks good." (Id.) Defendant Basham-Callaway completed a Consultation Sheet concerning Plaintiff's request to see Dr. Paine regarding the "pinching sensation in her upper lip." (Document No. 43-4, p. 22.) The Consultation Report reveals that an appointment with Defendant Rehberg was scheduled for July 17, 2007. (Id.) On July 17, 2007, Defendant Rehberg examined Plaintiff noting that the "scars look good," tension in the scars is to be expected, a suture knot can be felt in each scar, and a possible fluid collection in the upper lip. (Id.) Defendant Rehberg documented that he called Dr. Paine regarding the possible fluid build up. (Id.) Defendant Rehberg noted that he would see Plaintiff in two to four weeks. (Id.)

On December 18, 2007, Plaintiff reported to sick call complaining of possible cancer on her bicep and lip. (Document No. 37-3, p. 28.) The nurse noted that Plaintiff had a spot under her right bicep and a small lesion with swelling to the right of the scar on her lower lip. (Id.) It was further noted that Plaintiff had two complaints, and the policy requires only one complaint per sick call visit. (Id., p. 22.) Plaintiff's complaint concerning her arm was addressed on the above visit, and she was directed to return to sick call for the lip lesion. (Id.) The matter was referred to Defendant Rehberg due to Plaintiff's history of cancer. (Id.) On December 20, 2007, Plaintiff reported to sick call complaining of possible reoccurring skin cancer on her lip. (Id., pp. 26 - 27.) The nurse noted that

there was no swelling and that a provider would evaluate Plaintiff within a couple of weeks. (Id., p. 27.) On January 3, 2008, Plaintiff reported to Health Services where she was evaluated by Dana Renick, Physician Assistant, and Defendant Rehberg. (Id., p. 24.) Plaintiff indicated that she believed her skin cancer was reoccurring and complained that she had never had a surgical follow-up. (Id.) It was noted that Plaintiff had some tissue changes of 8 mm to 1 cm from the surgical scar, and "depigmentation of the lip line lateral from the mouth on left side." (Id.) Based on Plaintiff's continued complaint of pain in her arm, Defendant Rehberg ordered an x-ray of her right arm to be followed by an MRI. (Id.) It was further noted a consult would be made with the Utilization Review Committee "for a post-op surgical follow-up." (Id.)

On January 15, 2008, Physician Assistant Renick noted that Plaintiff reported at the Chronic Care Center, "but needs to see physician." (Id., p. 25.) Physician Assistant Renick also noted that she submitted a second consult to the Utilization Review Committee "for post-op check." (Id.) On January 24, 2008, the Utilization Review Committee approved the request for an appointment with Dr. Paine. (Document No. 43-2, p. 2.) On February 12, 2008, Plaintiff was evaluated by Defendant Rehberg in the Chronic Care Center. (Id., p. 13.) Defendant Rehberg noted that Plaintiff's upper and lower lips "looks good" with "minimal scarring," "good lip mobility," and "no new growth currently showing." (Id.) Plaintiff did not report any further complaints concerning her lip prior to her release from custody in September, 2008. (Id.)

Medical Treatment for H. Pylori:

On April 19, 2007, Plaintiff was evaluated by Defendant Basham-Callaway in the Chronic Care Clinic. (Document No. 37-3, p. 60.) Plaintiff complained that "when she eats she gets acid reflux" and "certain foods, especially greasy foods, aggravates this." (Id.) Defendant Basham-

Callaway noted that Plaintiff was taking ranitidine,[9] which Plaintiff indicated was helping. (Id.) Defendant Basham-Callaway continued the prescription for ranitidine and ordered a H. Pylori test. (Id.) The H. Pylori test was conducted on April 25, 2007. (Document No. 37-4, p. 31.) Defendant Basham-Callaway received the test results on May 2, 2007, which were positive for H. Pylori.[10] (Id.) On June 7, 2007, Plaintiff reported to sick call requesting a refill for her ranitidine prescription. (Document No. 37-3, p. 49.) The nurse noted that Plaintiff's prescription for ranitidine was contingent upon Plaintiff being indigent, and if Plaintiff was not indigent, she was instructed to buy the medication from the commissary. (Id.) Plaintiff advised the nurse that she was no longer indigent and the nurse instructed Plaintiff to buy her medication from the commissary. (Id., pp. 49 - 50.)

On July 11, 2007, Plaintiff was evaluated by Defendant Basham-Callaway in the Chronic Care Clinic. (Id., pp. 44 - 45.) Defendant Basham-Callaway noted that Plaintiff tested positive for H. Pylori and "she has epigastric pain in her stomach right after she eats." (Id., p. 44.) Defendant Basham-Callaway educated Plaintiff concerning H. Pylori and prescribed the following medications to treat her H. Pylori: Biaxin, Amoxil, and Omeprazole.[11] (Id., p. 45.) On August 7, 2007, Plaintiff reported to sick call complaining of stomach pain and constant diarrhea. (Id., p. 38.) The nurse noted that Plaintiff received treatment for her H. Pylori on July 11, 2007 and that she "has receipt for over-the-counter Zantac." (Id., p. 38.) The nurse scheduled an appointment with a provider. (Id., p. 39.) On August 14, 2007, Plaintiff was evaluated by P.A. Renick. (Id., p. 37.) Plaintiff complained that

_____

[9] Ranitidine is the generic form of Zantac.

[10] Helicobacter pylori (H. Pylori) is a bacterium that infects the stomach or small intestine. The H. Pylori infection is thought to be present in about half of the people in the world.

[11] Defendant Rehberg states as follows: "Prilosec, or omeprazole, is a proton-pump inhibitor, which blocks the production of stomach acid. It is used for the treatment of GERD, among other things. Diarrhea is a common side effect." (Document No. 67-2, p. 2.)

15

she "still is having pain after meals, worsened with meaty or greasy foods." (Id.) Plaintiff indicated

that "swallowing ice cubes makes it better." (Id.) P.A. Renick educated Plaintiff concerning her diet

and prescribed Carafate 1 gram[12] to be taken "one hour before meals and bedtime for eight weeks."

(Id.)

     On October 29, 2007, Plaintiff was evaluated by P.A. Renick in the Chronic Care Clinic. (Id.,

pp. 30 - 31.) P.A. Renick noted that Plaintiff was "treated for H. Pylori but states pain is 7 out of 10,

worse after eating and spicy food makes it worse. Now having diarrhea with each meal." (Id., p. 30.)

P.A. Renick prescribed Zantac and ordered labs and three random hemoccult tests. (Id., p. 31.) On

February 12, 2008, Plaintiff was evaluated by Defendant Rehberg in the Chronic Care Clinic. (Id.,

pp. 20 - 21.) Plaintiff reported having stomach pain after eating greasy food. (Id., p. 20.) Defendant

Rehberg prescribed Zantac. (Id., p. 21.) An EGD with biopsy was conducted on March 13, 2008. (Id.,

pp. 17 - 18.) The "Operative Report Results" diagnosed Plaintiff with "reflux esophagitis, grade 2

[and] moderate gastritis."[13] (Document No. 37-4, p. 54.) The biopsy of esophagus and antrum

revealed that the tissue was benign.[14] (Id., pp. 52 - 53.) On May 19, 2008, Plaintiff was evaluated by

Defendant Rehberg in the Chronic Care Clinic. (Document No. 37-3, pp. 15 - 16.) Plaintiff

---

[12]  Defendant Rehberg declares that "Carafate is an oral drug often used to treat GERD. It coats and protects the stomach lining." (Document No. 67-2, p. 2.)

[13]  The "Operative Report Results" stated as follows (Document No. 37-4, p. 54.): The posterior pharyngeal region was unremarkable. The esophagus was intubated. The stomach was intubated without difficulty. The gastric mucosal pattern was evaluated. The pylorus was transversed. The duodenum was evaluated. Biopsies of the esophagus and antrum were obtained. The morphology of the body and cardia of the stomach was noted to be unremarkable. The stomach was decompressed. The patient tolerated the procedure well.

[14]  The biopsy of the antrum revealed "gastritis chronic active with Helicobacter Pylori." (Document No. 37-4, p. 52.) The biopsy of the esophagus revealed "gastroesophageal mucosal epithelium with reparative reaction, negative for both dysplasia and intestinal metaplasia." (Id.)

complained of diarrhea after meals and reported having her gallbladder removed in 2005. (Id., p. 15.) Defendant Rehberg noted that Plaintiff denied a dairy intolerance and had been treated for H. Pylori. (Id.) Defendant Rehberg renewed Plaintiff's prescription for Zantac and other medications. (Id., p. 16.) On August 21, 2008, Plaintiff was evaluated by Dr. Wright, Clinical Director, in the Chronic Care Clinic. (Id., pp. 10 - 11.) Dr. Wright changed her medication from Zantac to Omeprazole. (Id., p. 11.)

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a pro se Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine

issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

A.   **FTCA Claim:**

An inmate "can sue under the FTCA to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

18

The FTCA, however, does not create a new cause of action. <u>Medina v. United States</u>, 259 F.3d 220, 223 (4th Cir. 2001). The statute merely "permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." <u>Id.</u>

In the present case, Plaintiff alleges that Defendants' negligent acts occurred in the State of West Virginia. Accordingly, West Virginia State law applies. Under West Virginia law, a plaintiff must satisfy certain prerequisites prior to filing suit against a health care provider. Specifically, a plaintiff must serve each defendant health care provider with a notice of claim with an attached screening certificate of merit executed under oath by a health care provider qualified as an expert under the West Virginia Rules of Evidence at least thirty (30) days prior to filing suit. W. Va. Code § 55-7B-6.[15] Compliance with West Virginia Code § 55-7B-6 is mandatory prior to filing suit in

---

[15] West Virginia Code § 55-7B-6 provides the following in pertinent part:

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of Rule 15 of the Rules of Civil Procedure.

19

federal court. Stanley v. United States, 321 F.Supp.2d 805, 806-07 (N.D.W.Va. 2004); also see Starns v. United States, 923 F.2d 34 (4th Cir. 1991)(holding that Virginia's medical malpractice liability cap applies to claims brought against the United States under the FTCA). West Virginia Code § 55-7B-6(c), however, provides that no screening certificate of merit is necessary where "the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care."

Plaintiff alleges that federal employees at FCP Alderson acted with medical negligence in diagnosing and treating her skin cancer.[16] In its Motion to Dismiss, the United States contends that Plaintiff's claim should be dismissed because she failed to timely and properly file a notice of claim and a screening certificate of merit pursuant to the MPLA. (Document No. 61.) In Response to the United States' Motion, Plaintiff alleges that Defendants' "incompetency is plain to see." (Document No. 70, p. 7.) Therefore, Plaintiff appears to argue that she should be excused from filing a screening certificate of merit. (Id.)

Under West Virginia law, "[i]t is the general rule that in medical malpractice cases, negligence or want of professional skill can be proved only by expert witnesses." Syllabus Point 2, Roberts v. Gale, 149 W.Va. 166, 139 S.Ed.2d 272 (1964). Expert testimony, however, is not required

---

[16] The undersigned notes that there is no evidence that Plaintiff properly exhausted her H. Pylori claim for FTCA purposes. (Document No. 61-1.) The FTCA is a limited waiver of sovereign immunity. This waiver is subject to the condition that an administrative claim must first be submitted to the appropriate agency and denied before suit can be filed. *See* 28 U.S.C. § 2675(a). *See also Bellomy v. United States*, 888 F. Supp. 760 (S.D.W.Va. 1995). Filing a timely administrative claim is jurisdictional and cannot be waived. *Ahmed v. United States*, 30 F.3d 514, 516 (4th Cir. 1994) (*citing Henderson v. United States*, 785 F.2d 121, 123 (4th Cir. 1986), *Muth v. United States*, 1 F.3d 246 (4th Cir. 1993). Thus, before an individual can bring a claim under the FTCA, the individual must exhaust procedures specified at 28 C.F.R. §§ 14.1 to 14.11 and 543.30 to 543.32. Moreover, even assuming that Plaintiff properly exhausted her H. Pylori claim for FTCA purposes, Plaintiff has failed to submit a screening certificate of merit.

"where the lack of care or want of skill is so gross as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience." Farley v. Shook, 218 W.Va. 680, 629 S.E.2d 739 (2006). The MPLA provides as follows concerning claims "based upon a well-established legal theory of liability":

> Notwithstanding any provision of this code, if a claimant or his or her counsel, believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care, the claimant or his or her counsel, shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit.

West Virginia Code § 55-7B-6(c). In Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D.W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the filing of a claim without submitting a certificate of merit. Id. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and infection." Id. at 858.

Unlike the facts in Johnson, Plaintiff's allegations of medical negligence are complex and expert testimony is necessary. See O'Neil v. United States, 2008 WL 906470 (S.D.W.Va. Mar. 31, 2008)(finding that plaintiff was not excused from filing a screening certificate of merit because the treatment and diagnosis of Graves disease, hyperthyroidism, congestive heart failure, and cardiomyopathy, are not within the understanding of lay jurors by resort to common knowledge and experience). In the instant case, it appears that the medical staff at FCP Alderson evaluated,

21

diagnosed, and provided treatment for Plaintiff's skin cancer. Plaintiff, however, contends that medical staff failed to timely diagnose and treat her skin cancer, which resulted in the disfigurement of her face. Expert testimony is necessary to support any finding that the medical treatment provided by the staff at FCP Alderson fell below the applicable standard of care. The undersigned finds that the symptoms of skin cancer, appropriate diagnostic testing, and proper treatment options, are not within the understanding of lay jurors by resort to common knowledge and experience. Accordingly, Plaintiff is not excused from filing a screening certificate of merit pursuant to West Virginia Code § 55-7B-6(c). The undersigned, therefore, recommends that Plaintiff's FTCA claim be dismissed because there is nothing in Plaintiff's Complaint or exhibits indicating that Plaintiff complied with the requirements of West Virginia Code § 55-7B-6.

## B.    Bivens Claim:

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A Bivens action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a

22

claim under <u>Bivens</u> must show the violation of a valid constitutional right by a person acting under color of federal law.[17] The United States Supreme Court has held that an inmate may name a federal officer in an individual capacity as a defendant in alleging an Eighth Amendment constitutional violation pursuant to <u>Bivens</u>. <u>See</u> <u>Wilson v. Seiter</u>, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). However, <u>Bivens</u> claims are not actionable against the United States, federal agencies, or public officials acting in their official capacities. <u>See</u> <u>FDIC v. Meyer</u>, 510 U.S. 471, 475, 484-86, 114 S.Ct. 996, 127 L.Ed. 2d 308 (1994); <u>Berger v. Pierce</u>, 933 F.2d 393, 397 (6th Cir. 1991); <u>Reinbold v. Evers</u>, 187 F.3d 348, 355 n. 7 (4th Cir. 1999).

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)(1996), requires that inmates exhaust available administrative remedies prior to filing civil actions though the administrative process may not afford them the relief they might obtain through civil proceedings.[18] <u>Woodford v. Ngo</u>, 548 U.S.

---

[17] Inmates may file claims of liability against the United States under the FTCA but may not assert claims of personal liability against prison officials for violations of their constitutional rights. *Carlson v. Green*, 446 U.S. at 21-23, 100 S.Ct. at 1472 -74. By contrast, under *Bivens* inmates may assert claims of personal liability against individual prison officials for violations of their constitutional rights but may not assert claims against the government or prison officials in their official capacities. The Supreme Court held in *Carlson*, 446 U.S. at 18 - 21, 100 S.Ct. at 1471-72, that an inmate could pursue a *Bivens* action independent of a FTCA action. The Court found that Congress did not intend to pre-empt a *Bivens* remedy when it enacted the FTCA. *Id.* The Court noted that the legislative history of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.*, 446 U.S. at 19 - 20, 100 S.Ct. at 1471 -72. Relying upon *Carlson*, the Fourth Circuit found that the availability of relief under the FTCA does not automatically foreclose a *Bivens* action. *Dunbar Corp v. Lindsey*, 905 F.2d 754, 762 (4th Cir. 1990). The Court pointed out other distinctions between FTCA and *Bivens* actions in *Dunbar Corp.*: (1) only compensatory damages are available in FTCA actions, whereas compensatory and punitive damages are available under *Bivens* and (2) FTCA claims must be tried to the Court, whereas *Bivens* claims may be tried to a jury. *Id.*

[18] 42 U.S.C. § 1997e(a) provides as follows:

No action shall be brought with respect to prison conditions under section 1983 of this title or any other federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available are exhausted.

23

81, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006); Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983,

152 L.Ed.2d 12 (2002)(The Prison Litigation Reform Act's exhaustion requirement applies to all

inmate suits about prison life whether they involve general circumstances or particular episodes and

whether they allege excessive force or some other wrong.); Booth v. Churner, 532 U.S. 731, 121

S.Ct. 1819, 1820,149 L.Ed.2d 958 (2001)("Under 42 U.S.C. § 1997e(a), an inmate seeking only

money damages must complete any prison administrative process capable of addressing the inmate's

complaint and providing some form of relief, even if the process does not make specific provision

for monetary relief."). "[T]here is no futility exception to the PLRA's exhaustion requirement."

Massey v. Helman, 196 F.3d 727, 733 (7th Cir. 1999). But the plain language of the statute requires

that only "available" administrative remedies be exhausted. A grievance procedure is not "available"

if prison officials prevent an inmate from using it. Dale v. Lappin, 376 F.3d 652, 656 (7th Cir. 2004);

Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003)(inmate lacked available administrative remedies

for exhaustion purposes where inmate was unable to file a grievance because prison officials refused

to provide him with the necessary grievance forms); Miller v. Norris, 247 F.3d 736, 740 (8th Cir.

2001)(allegations that prison officials failed to respond to his written requests for grievance forms

were sufficient to raise an inference that inmate had exhausted his available administrative remedies.)

　　　If an inmate exhausts administrative remedies with respect to some, but not all, of the claims

she raises in a Section 1983, Bivens or FTCA action, the Court must dismiss the unexhausted claims

and proceed with the exhausted ones. See Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 913, 166

L.Ed.2d 798 (2007)("The PLRA does not require dismissal of the entire complaint when a prisoner

has failed to exhaust some, but not all, of the claims included in the complaint. * * * If a complaint

contains both good and bad claims, the court proceeds with the good and leaves the bad.") It appears

to be the majority view as well that exhausting administrative remedies after a Complaint is filed will

not save a case from dismissal. See Neal v. Goord, 267 F.3d 116, 121-22 (2d Cir. 2001)(*overruled on other grounds*), a Section 1983 action, citing numerous cases. The rationale is pragmatic. As the Court stated in Neal, allowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court. Moreover, if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court would have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset. Neal, 267 F.3d at 123. In Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999), the Court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court.. . .The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." Thus, the PLRA requires that available administrative remedies must be exhausted before the filing of a suit in Federal Court. It is further clear that the PLRA does not require that an inmate allege or demonstrate that she has exhausted her administrative remedies. See Jones v. Bock, supra; Anderson v. XYZ Correctional Health Services, 407 F.3d 674, 677 (4th Cir. 2005). Failure to exhaust administrative remedies is an affirmative defense. Prison officials have the burden of proving that the inmate had available remedies which she did not exhaust. See Dale v. Lappin, 376 F.3d 652, 655 (7th Cir. 2004)("Although exhaustion of administrative remedies is a precondition to a federal prisoner filing a Bivens suit, [citations omitted] failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving." (Citations omitted))

For Bivens purposes, proper exhaustion of available administrative remedies requires that "a prisoner must submit inmate complaints and appeals in the place, and at the time, the prison's administrative rules require." Dale v. Lappin, 376 F.3d at 655 (internal citations omitted); also see Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006)(stating that "[p]roper

25

exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings"). The Federal Bureau of Prisons [BOP] has established an Administrative Remedy Program, 28 C.F.R. § 542.10, *et seq.*, through which an inmate may seek formal review of issues or complaints relating to confinement. Depending upon at what level an inmate initiates it, the BOP's Administrative Remedy Program is a three-step or four-step grievance procedure. As a general matter, a federal inmate is required first to attempt to resolve her complaints informally by the submission of an "Inmate Request to Staff Member" form. 28 C.F.R. § 542.13. The inmate's request may be rejected if improper, and the inmate will then be advised of the proper administrative procedure. Id. Within 20 days after the circumstances occurred which are the subject of the inmate's complaints, the inmate must complete this first step and submit a formal "Administrative Remedy Request" on a BP-9 form to an institution staff member designated to receive such Requests, 28 C.F.R. § 542.14(a) and (c)(4), or under exceptional circumstances to the appropriate Regional Director. Id., § 542.14(d). The Warden of the institution and the Regional Director must respond to the inmate's Request within 20 and 30 days respectively. Id., § 542.18. If the inmate's Request was directed to the Warden of the institution and the Warden's response is unfavorable, the inmate may appeal within 20 days to the Regional Director on a BP-10. Id., § 542.15(a) and (b). If the Regional Director's response is unfavorable, the inmate may appeal to General Counsel on a BP-11 form within 30 days after the Regional Director signed the response. Id., § 542.15(a). General Counsel has 40 days to respond to the inmate's appeal. Id., § 542.18. The administrative process is exhausted when General Counsel issues a ruling on the inmate's final appeal. Id., § 542.15(a). The entire process takes about 120 days to complete. An inmate's submission may be rejected at any level for failure to comply with the administrative remedy requirements or if

the submission is written in an obscene or abusive manner. Id., § 542.17(a). The inmate will be provided with notice of any defect and whether the defect is correctable. Id., § 542.17(b). If a request or appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection to the next appeal level. Id., § 542.17(c).

In their Motion, Defendants argue that "[a]lthough Plaintiff filed administrative remedies regarding her H. Pylori treatment, those remedies were not fully exhausted until after Plaintiff filed the instant action on December 10, 2007." (Document No. 68, p. 2.) In support, Defendants submit the Declaration of Ms. Sharon Wahl, a Paralegal for the Consolidated Legal Center at FCI Beckley. (Document No. 67-1.) Ms. Wahl states that "[t]he Beckley Consolidated Legal Center oversees legal matters arising at various Bureau of Prisons institutions, including matters that arise at the Federal Prison Camp, Alderson, West Virginia." (Id., p. 1.) Ms. Wahl declares that in her position she has access to SENTRY, the Bureau of Prisons' online system containing, among other things, information about inmates' administrative remedy filings. (Id.) Ms. Wahl explains that she also has access to inmates' central files and medical records. (Id.) Specifically, Ms. Wahl states as follows in her Declaration (Id., pp. 1 - 2.):

> 5. A review of Plaintiff's administrative remedy history in the instant case as found on SENTRY shows Plaintiff filed six administrative remedies while in the custody of the BOP.
>
> 6. All of Plaintiff's remedies concern medical care at FPC Alderson.
>
> 7. Plaintiff filed a remedy at the institution level (Remedy ID 464863-F1) on August 30, 2007, complaining of inadequate medical treatment, including treatment for H. Pylori.
>
> 8. The request was denied on September 13, 2007.
>
> 9. Plaintiff appealed the denial to the Regional Office level (Remedy ID 464863-R1) on October 11, 2007, where it was denied on November 26, 2007.

27

10.     Plaintiff appealed to the Central Office level on January 3, 2008 (Remedy ID 464863-A1).

11.     Plaintiff's remedy request was closed for informational purposes on February 28, 2008.

In response, Plaintiff merely states she exhausted her administrative remedies. (Document No. 71, p. 2.) In a prior filing, Plaintiff filed the following Exhibits: (1) A copy of "Receipt - Administrative Remedy" acknowledging the receipt of an administrative remedy request on August 30, 2007, in Remedy ID 464863-F1 (Document No. 45-1, p. 2.); (2) A copy of Warden Nelson's "Response to Administrative Remedy # 464863-F1," dated September 13, 2007 (Id., p. 5.); (3) A copy of Plaintiff's "Regional Administrative Remedy Appeal" dated October 8, 2007 (Id., p. 9.); (4) A copy of "Receipt - Administrative Remedy" acknowledging the receipt of the regional appeal on October 11, 2007, in Remedy ID 464863-R1 (Id., p. 6.); (5) A copy of an "Extension of Time for Response - Administrative Remedy" dated October 17, 2007, stating that "additional time is needed to respond to the regional appeal" in Remedy ID 464863-R1 (Id., p. 7.); (6) A copy of Regional Director K.M. White's Response dated November 26, 2007, denying Remedy ID 464863-R1 (Id., p. 10.); (7) A copy of Plaintiff's "Central Office Administrative Remedy Appeal" dated December 18, 2007 (Id., p. 13.); (8) A copy of an "Extension of Time for Response - Administrative Remedy" dated February 19, 2008, stating that "additional time is needed to respond to the central office appeal" in Remedy ID 464863-A1 (Id., p. 11.); and (9) A copy of Administrator Harrell Watts' Response for "informational purposes" dated February 28, 2008, concerning Remedy ID 464863-A1(Id., p. 14.).

Based upon the foregoing, the undersigned finds that Plaintiff failed to properly exhaust her administrative remedies concerning her H. Pylori claim prior to filing her Complaint. The Court notes that Plaintiff filed her Complaint on December 10, 2007, and did not fully exhaust her administrative

remedies until February 28, 2008.[19] Although Plaintiff eventually exhausted her administrative remedies, she failed to properly exhaust those remedies prior to filing her Complaint. As stated above, the PLRA requires that available administrative remedies must be exhausted before the filing of a suit in federal court. Because Plaintiff failed to properly exhaust administrative remedies with respect to her claims in this matter, the undersigned concludes, and hereby respectfully recommends, that this matter should be dismissed.

Although it is unnecessary to address the other reasons which Defendants assert for dismissing this case, the undersigned finds generally that they have merit. The Court finds from the record as it currently exists that the circumstances underlying Plaintiff's claims in this matter do not indicate deliberate indifference to Plaintiff's serious medical needs in violation of her rights under the Eighth Amendment of the United States Constitution. Plaintiff's broad and nonspecific allegations that Defendants failed to provide adequate medical treatment for her H. Pylori are insufficient. Plaintiff fails to allege facts sufficient to satisfy the subjective component of deliberate indifference. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to her. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff, however, fails to allege sufficient facts as to how each Defendant knew of and disregarded an excessive risk to her health or safety. Further, there is no evidence that Defendants were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, or that Defendants drew that inference. The record is void of any evidence that Defendants failed to respond to Plaintiff's requests for medical treatment or "sick call." Contrary to Plaintiff's allegations, the medical records reveal that Plaintiff was consistently evaluated and prescribed medication for her H. Pylori. Plaintiff merely

---

[19] As stated above, the administrative process is exhausted when General Counsel issues a ruling on the inmate's final appeal. See 28 C.F.R. § 542.15(a).

appears to disagree with the appropriate course of treatment. An inmate's disagreement with her medical care for an objectively serious medical injury generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation.") The undersigned further finds that an inmate is not entitled to the best possible care, only reasonable care. Geoff v. Bechtold, 632 F.Supp. 697, 698 (S.D.W.Va. 1986). Accordingly, the undersigned recommends that Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment be granted.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT** the United States' Motion to Dismiss (Document No. 61.) and Defendants Hickey, Lowe, Blankenship, Rehberg, and Basham-Callaway's Motion to Dismiss, or in the Alternative Motion for Summary Judgment (Document No. 67.), **DISMISS** Plaintiff's Complaint (Document No.1.) and remove this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules

Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(e) of the Federal Rules of Criminal Procedure, the parties shall have seventeen (17) days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of these Findings and Recommendation within which to file with the Clerk of this Court, written objections, identifying the portions of the Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208, 104 S. Ct. 2395, 81 L. Ed. 2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Petitioner, who is acting *pro se*, and transmit a copy to counsel of record.

Date: January 3, 2011.

R. Clarke VanDervort
United States Magistrate Judge

31